**Jonathan SAVIDGE, et al.,
Plaintiffs-Appellants,**

v.

**Jaylon FINCANNON, et al.,
Defendants-Appellees.**

**No. 86–1841.**

United States Court of Appeals,
Fifth Circuit.

Feb. 3, 1988.

Rehearing and Rehearing En Banc
Denied March 17, 1988.

---

David Ferleger, Barbara Hoffman, Philadelphia, Pa., for plaintiffs-appellants.

Leslie L. McCollom, Toni Hunter, Asst. Attys. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for defendants-appellees.

\* Formerly Carolyn Dineen Randall

Before WISDOM, GEE, and KING \*, Circuit Judges.

WISDOM, Circuit Judge:

This appeal presents two questions. The first involves the plaintiffs' eligibility to recover attorney's fees under 42 U.S.C. § 1988 for legal work performed on an aspect of their case that became moot before reaching judgment and was arguably barred by res judicata. The second question concerns the scope of qualified official immunity doctrine. After reviewing the tortuous path that brought these parties before us, we conclude that in denying attorney's fees without a hearing, and in granting immunity to the individual defendants, the district court erred. We therefore remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. The *Savidge* Complaint

The plaintiffs in this case are Jonathan Savidge and his parents, Wilbur and Felicia Savidge. At this time, Jonathan is a profoundly retarded fifteen-year-old boy.[1] From September 1980 until May 1986, Jonathan lived at the Fort Worth State School for the retarded (FWSS) in Forth Worth, Texas. In January 1983, the plaintiffs sued Texas, the Texas Department of Mental Health and Mental Retardation (DMHMR), and four individual employees of the FWSS. The plaintiffs sought compensation for damages allegedly arising from past and continuing violations of Jonathan's constitutional rights.

According to the Savidges' complaint, living conditions at the FWSS were "oppressive, inappropriate, unhealthy, filthy, abusive and restrictive". Among other allegations, the plaintiffs allege that the building Jonathan lived in was "permeated with stench"; that Jonathan and other residents were left "to play in each other's feces"; that Jonathan's medications were poorly monitored; that Jonathan was repeatedly bitten by other residents; and that the

---

1. According to reports in the record, Jonathan can feed himself with a spoon, but he cannot dress or undress. He likes to play peek-a-boo.

wheelchair he used was so small (it was the original one he had when he entered FWSS) that it worsened the spinal condition (scoliosis) that afflicts him. In short, the complaint in this case describes an environment so unhealthy that it physically threatened Jonathan Savidge.[2]

The plaintiffs contend that conditions at the FWSS violated Jonathan's constitutional right to reasonably safe institutional care from the time he arrived until the time he left. One episode in the winter of 1980–81 illustrates the seriousness of their claim. The plaintiffs maintain that the defendants assigned Jonathan, a child known to have a special susceptibility to infection, to a ward in the FWSS with a "dangerously high level of infectious staphlococcus [sic] bacteria". A few months after his arrival, Jonathan suffered a fever and "infected boils". By early 1981, the boils had enlarged and Jonathan's fever climbed as high as 105.8° Farenheit. Jonathan developed a hand-sized swelling on the right side of his ribcage. As it is described in the complaint, the treatment that the individually-named defendants provided for Jonathan was shockingly inadequate. As a direct result of the defendants' conduct, plaintiffs allege, Jonathan Savidge required surgery that left him partially paralyzed.

The complaint explains the relationship between each individual defendant and Jonathan Savidge. It further alleges that:

> Defendants knew or should have known that their actions and inactions which resulted in harms to [the plaintiffs] were illegal and a violation of plaintiffs' rights under federal and state law.[3]

The plaintiffs state that violations of their constitutional rights are actionable under 42 U.S.C. § 1983. In their prayer for relief they request damages and a declaratory judgment, but no injunction.

**B. The Emergency Motion**

In September 1983, eight months after they had filed their complaint, the plaintiffs petitioned the district court for an "emergency" injunctive order requiring the defendants to place Jonathan in a community-based residence. The parties engaged in several months of discovery on the issue of Jonathan's right to injunctive relief. On January 5, 1984, the district court severed the motion for an injunction from the rest of the case, and scheduled the motion for trial.

The injunction hearing lasted for four days. Contrary to a suggestion the defendants have often made, the district judge did not hear evidence relating directly to the plaintiffs' claim for damages. The expert testimony focused on harms that might befall Jonathan in the future, not those he had already suffered.[4] There was a great deal of conflicting evidence about the potential cost of transferring Jonathan to a community-based residence; the conduct of the individual defendants, by contrast, was never mentioned. On March 1, 1984, the district court took the "emergency" motion for injunctive relief under advisement.

**C. The Lelsz Litigation**

Some of the difficulty and much of the delay in this case are a result of Jonathan Savidge's participation in a class action against the FWSS and two similar Texas institutions. That class action, Lelsz v. Kavanaugh, began in 1974 in the Eastern District of Texas. The Lelsz plaintiffs alleged that the institutional care provided by the defendants violated both state and federal law. Roughly speaking, the Lelsz class sought more therapy, smaller residences, and cleaner surroundings. The

---

2. In addition, the plaintiffs allege that the defendants' failure to provide Jonathan with proper therapy contributed to a "regression" in his level of behavior.

3. The plaintiffs also allege that the "[d]efendants have acted with malice, with gross indifference to plaintiffs' rights and needs, and with gross disregard of whether they were violating plaintiffs' constitutional and other rights".

4. Dr. Sue Gant, the plaintiff's leading expert at the hearing on the injunction, made it clear that she had not reviewed Jonathan's "historical record". Similarly, both sides treated past deficiencies at the FWSS as irrelevant, even when they involved serious matters of hygiene that could have been responsible for some of Jonathan's damages.

*Lelsz* litigation was seemingly settled by a consent decree in mid–1983, several months after the filing of the initial complaint in *Savidge*, and several months before the "emergency" motion was filed.

The *Lelsz* decree established that the defendants would provide "habilitation", or individualized therapy, to each member of the plaintiff class. It also stated that "[d]efendants will provide each member of the plaintiff class with the least restrictive living conditions possible consistent with the person's particular circumstances ..." In return for these and other promises, the plaintiffs—including Jonathan Savidge—agreed to a statement that "[t]hese provisions include a final resolution of the defendants' obligations towards the members of the plaintiff class and of the issues raised by this litigation".

In February 1985, in an effort to correct what they viewed as unnecessary foot-dragging by the state, the *Lelsz* plaintiffs filed a "Motion for Community Placement". After a hearing, the district court granted this motion in part, and ordered that 279 members of the *Lelsz* class be transferred to community centers on or before September 1, 1986.

On appeal, a panel of this Court ruled that the district court was without jurisdiction to enforce key sections of the consent decree.[5] The Court, relying on *Pennhurst*,[6] reasoned that insofar as the consent decree was based upon state law it was entered in violation of the Eleventh Amendment. And to the extent the consent decree rested upon federal constitutional rights to "habilitation" and place-

ment in a "least restrictive environment", the Court denied that the *Lelsz* class enjoyed such rights. The Court then concluded that:

[t]here being no constitutional scope to [the paragraphs in the settlement agreement invoked by the plaintiffs], the district court's decree purporting to enforce them may not rest on that authority and is unauthorized.[7]

In other words, not only did the Court vacate the district court's enforcement order, it also cast doubt upon the underlying consent decree.[8] This doubt, as we shall see, complicates the res judicata effect of *Lelsz* upon *Savidge*.

## D. The post-trial history of *Savidge*

When we left *Savidge*, the district court had bifurcated the case and had tried the plaintiffs' motion for an injunction. The next two years saw the following developments: 1) the case was transferred from the Northern to the Eastern District of Texas, then the exclusive forum for the *Lelsz* litigation;[9] 2) the case was transferred back to the Northern District; 3) the case was dismissed without prejudice to the plaintiffs' right to refile in the Eastern District; and, 4) the dismissal was reversed on appeal.[10] At this point, in early May of 1986, with the Northern District finally established as the proper forum for the case, and with a decision on the plaintiffs' motion apparently imminent, the defendants transferred Jonathan to a community-based residence and agreed to furnish him a proper wheelchair. This effectively gave the plaintiffs all the injunctive relief they had ever sought.[11]

---

5. *Lelsz v. Kavanaugh,* 807 F.2d 1243 (5th Cir. 1987).

6. *Pennhurst State School v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

7. *Lelsz v. Kavanaugh,* 807 F.2d at 1251 (footnote omitted).

8. In denying the *Lelsz* plaintiffs a rehearing, an en banc majority of this Court noted that the panel decision "nullified" portions of the 1983 consent decree. *Lelsz v. Kavanaugh,* 815 F.2d 1034, 1034 (5th Cir.1987). More recently, in August 1987, a different panel of this Court observed that "[a]lthough it may be unclear how much life remains in the consent decree ...,

some does". *Lelsz v. Kavanaugh,* 824 F.2d 372 (5th Cir.), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987).

9. *Cf. Johnson v. McKaskle,* 727 F.2d 498 (5th Cir.1984).

10. *Savidge v. Fincannon,* 784 F.2d 186 (5th Cir. 1986).

11. The plaintiffs' Motion for Judgment, filed shortly after Jonathan's transfer, acknowledges that "Jonathan Savidge now has, at least on a temporary basis, an individual program plan which includes the individualized community treatment he has sought for three years in this

Nonetheless, a few weeks later the plaintiffs filed a "Motion for Judgment on Permanent Injunction and for Discovery and Trial Schedule on Damage Portion of Case". The plaintiffs sought a "Judgment ... incorporating the new placement and allowing for appropriate professional program modifications". In a proposed order attached as an appendix to the motion, the plaintiffs suggested that they be awarded attorney's fees under 42 U.S.C. § 1988. The defendants opposed this motion and asked the court to rule on *their* motion—filed on September 23, 1983—for summary judgment on the damages portion of the case.

On October 30, without making reference to the possible mootness problem, the district court finally denied the plaintiffs' "emergency" motion for injunctive relief. The court ruled that "[a]s a member of the class which was afforded injunctive relief in the *Lelsz* settlement, plaintiff is barred from receiving extraordinary relief from this Court by the doctrine of *res judicata* ".[12] The court then denied the plaintiffs' indirect request for attorney's fees with the observation that "this lawsuit did not serve as an impetus for the eventual placement of Jonathan Savidge in a small, community setting ...".

The district court also denied the plaintiffs' claim for damages. Relying upon the Supreme Court's decision in *Edelman v. Jordan*,[13] the court held that the Eleventh Amendment necessarily precluded "all monetary damages sought". Four of the defendants had been sued as private individuals, however, and on February 5, 1987, the court clarified its order, stating that it

> did intend in its October 30, 1986 Order to deny all of Plaintiffs' damage claims against the Defendants in their individual capacities because Plaintiffs failed to state a federal claim in light of Defendants' qualified immunity defense.[14]

In form this order merely denied a motion filed by the plaintiffs, but in effect it left the parties with nothing left to litigate.[15] The plaintiffs filed a timely appeal.

### E. The present appeal

The plaintiffs are not now seeking any injunctive relief for Jonathan Savidge. They concede that the Eleventh Amendment bars their claim for damages against the State of Texas, the DMHMR, and the individual defendants sued in their capacity as state officials. On the other hand, the defendants concede that the Eleventh Amendment does *not* protect the four individual defendants from claims against them in their capacity as private persons acting under color of state law.[16] The defendants also agree that the damages portion of the plaintiffs' case is not precluded by the *Lelsz* litigation.

In their appeal, the plaintiffs object first to the denial of attorney's fees. The district court abused its discretion, they ar-

---

litigation". In more than a year since his transfer there has been no indication from the parties that Jonathan has lost his group home placement.

**12.** At the time the district court issued this order, of course, the partial nullification of the *Lelsz* decree had not yet taken place.

**13.** 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

**14.** Notwithstanding the defendants' pending motion for summary judgment, we regard the district court's order, as clarified, as a judgment on the pleadings. Since the bifurcation of their case in 1983, the plaintiffs have not pursued any discovery on their damages claim, and no evidence directed to damages appears in the record. We are therefore bound by the Supreme Court's admonition that:

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.... Moreover, it is well established that, in passing on a motion to dismiss, ... the allegations of the complaint should be construed favorably to the pleader.

*Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

**15.** The defendants concede, and we agree, that this Court has jurisdiction to decide the plaintiffs' appeal under 28 U.S.C. § 1291.

**16.** *Kentucky v. Graham*, 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

gue, by ruling against them without allowing discovery, briefs, or a hearing on the question whether their lawsuit in fact led to Jonathan's transfer. Second, the plaintiffs challenge the district court's determination that the individual defendants in this case are entitled to qualified official immunity.

## II. ATTORNEY'S FEES

42 U.S.C. § 1983 establishes a cause of action for the Savidges' constitutional law claims. Congress has provided that in section 1983 cases, "the court in its discretion, may allow *the prevailing party* ... a reasonable attorney's fee as part of the costs".[17] In a gloss on this language based on the legislative history, the Supreme Court has held that when a section 1983 plaintiff prevails, "fees should be awarded 'unless special circumstances would render such an award unjust' ".[18] The district court in this case made no finding of special circumstances; the denial of fees was based upon an implicit determination that the plaintiffs had not "prevailed".

 It is now firmly established that a civil rights plaintiff may "prevail"—and

thus be presumptively entitled to fees—in a case that is settled, or otherwise becomes moot, before reaching a judgment on the merits.[19] We view this as such a case: as soon as Jonathan received his transfer, and the promise of a wheelchair, the plaintiffs' motion for injunctive relief became moot.[20] Because mootness removes a federal court's authority to adjudicate, the district court erred in deciding the plaintiffs' motion.[21] The parties' consent is no substitute for subject matter jurisdiction over an issue.

 In *Williams v. Leatherbury* we held that in the absence of a judgment a party may prevail "if its ends are accomplished as a result of the litigation".[22] In cases where the defendant unilaterally moots the suit, however, we will deny attorney's fees if the defendant can show that his conduct was "a wholly gratuitous response to an action that was itself frivolous or groundless".[23] In this case, to qualify as prevailing parties, the plaintiffs must show: 1) that they have received a substantial part of the injunctive relief they sought from the defendants, 2) as a

**17.** 42 U.S.C. § 1988 (emphasis added).

**18.** *Kentucky v. Graham,* 473 U.S. at 164, 105 S.Ct. at 3104 (quoting S.Rep. No. 94–1011, p. 4 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 5908).

**19.** *Smith v. Robinson,* 468 U.S. 992, 1006, 104 S.Ct. 3457, 3465, 82 L.Ed.2d 746 (1984); *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980) ("[n]othing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated"). The Court's most recent decision on attorney's fees is not to the contrary. *Hewitt v. Helms* involved litigation that had not brought the plaintiffs any material benefit at all. —— U.S. ——, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).

**20.** *See DeFunis v. Odegaard,* 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974). Because a ruling on the plaintiffs' motion was *not* required to establish their eligibility for attorney's fees, the district court's judgment does not come within the "collateral consequences" exception to mootness doctrine. *See generally* L. Tribe, *American Constitutional Law* 62–68 (1978). Similarly, we conclude on the basis of the record that there is no "reasonable expecta-

tion" that Jonathan will be unconstitutionally returned to the FWSS. *Cf. United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

**21.** *See Liner v. Jafco,* 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964). Because we vacate the district court's ruling on res judicata, we need not pass judgment upon the Third Circuit's suggestion that "a plaintiff may be prevailing party even though judgment was awarded in favor of the defendant". *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 912 (3d Cir.1985).

**22.** 672 F.2d 549, 550 (1982).

**23.** *Id.* at 551. *Accord Hennigan v. Ouachita Parish School Board,* 749 F.2d 1148, 1153 (5th Cir.1985) ("a plaintiff who brings an action that has no colorable, or even reasonable, likelihood of success on the merits is not entitled to recover attorney's fees"); *Garcia v. Guerra,* 744 F.2d 1159, 1163 (5th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 497 (1985) (plaintiff's claim must be "arguably supported by case or statutory law"). The defendant bears the burden of showing that the suit is frivolous. *Hennigan,* 749 F.2d at 1153.

result of this litigation. If this burden is met it remains for the defendants to establish that the Savidges' claims were frivolous, or obviously barred by res judicata.

■ Of the plaintiffs' two requirements, the first is met beyond any dispute.[24] The second, the requirement of causation, is vigorously contested by the parties. The district court found that "this lawsuit did not serve as an impetus for the eventual placement of Jonathan Savidge in a small, community setting ...".[25] We affirm findings of fact unless clearly erroneous, and the existence of causation in a dispute over attorney's fees is no exception.[26] In this case, however, we hold that the procedure leading to the district court's determination was inadequate.

The appendix to the plaintiffs' motion arguably placed the issue of attorney's fees before the district court. Nonetheless, we conclude that the court erred in deciding the "intensely factual" issue of causation without an evidentiary hearing.[27] It is possible that the defendants transferred Jonathan to comply with the consent decree in *Lelsz.* It is also possible, as the defendants themselves contend, that the decision to transfer Jonathan was "based upon the judgment of the trained professionals evaluating and monitoring his situation" independent of any pending litigation. Either of these explanations for the transfer, if

established on the basis of a properly developed record, would preclude an award of attorney's fees in this case.

On the other hand, it is also possible that the present suit was a significant factor behind Jonathan's transfer. The chronology of events, though by no means conclusive, is consistent with this third possibility. Moreover, the transcript of the injunction hearing contains references suggesting that the defendants paid "special attention" to Jonathan "because of his involvement in this litigation". The plaintiffs should be given an opportunity to develop and present evidence on this issue.

The decision whether to grant attorney's fees to a civil rights plaintiff carries great importance to society as a whole. In its report on the version of 42 U.S.C. § 1988 that is at issue in this case, the Senate Judiciary Committee observed that a fee shifting rule is necessary "[i]f our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce".[28] The legal services provided to the plaintiff in a vigorously prosecuted civil rights case may cost many thousands of dollars. Summary disposition of the plaintiff's petition for fees in such a case is generally not acceptable.[29]

The Savidges spent more than two years pursuing a court order that would transfer

---

**24.** Because the Savidges have received virtually *all* of the relief they sought in their emergency motion, we need not explore the issue of how little a plaintiff can obtain without losing "prevailing party" status. *See Hensley v. Eckerhart,* 461 U.S. 424, 439 n. 14, 103 S.Ct. 1933, 1942 n. 14, 76 L.Ed.2d 40 (1983) (suggesting that a district court may make a "limited fee award" when the relief obtained is "minor"). *But see Cobb v. Miller,* 818 F.2d 1227, 1231 (5th Cir. 1987) (plaintiff must "prevail[ ] on the central issue by acquiring the primary relief sought"). *See generally* Note, Attorneys' Fees: How Much Can a Partially Prevailing Plaintiff Recover in Civil Rights Actions?, 59 Tul.L.Rev. 473 (1984).

**25.** We have no objection to the standard employed by the district court. To establish causation in this circuit, a plaintiff seeking attorney's fees must show that his lawsuit was "*a* substantial factor or *a* significant catalyst in motivating the defendants to end their unconstitutional behavior". *Robinson v. Kimbrough,* 652 F.2d 458, 466 (5th Cir.1981) (emphasis added); *accord*

*Heath v. Brown,* 807 F.2d 1229, 1233 (5th Cir. 1987). The inquiry framed by the district court, *i.e.,* whether the lawsuit served as an impetus for Jonathan's transfer, appears to comport with our rule that the plaintiff's action need not be the *only* factor that influences the defendant. *Cf. Morrison v. Ayoob,* 627 F.2d 669, 671 (3d Cir.1980), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981) ( [w]here there is more than one cause, the plaintiff is a prevailing party if the action was a material factor in bringing about the defendant's action").

**26.** *Heath v. Brown,* 807 F.2d at 1234.

**27.** *Posada v. Lamb County,* 716 F.2d 1066, 1072 (5th Cir.1983).

**28.** S.Rep. No. 94–1011, p. 6 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 5908, 5913.

**29.** *Cf. Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d at 910 n. 22.

Jonathan from the FWSS. Their attorneys represented them through limited discovery, a trial with expert witnesses, several post-trial motions, and an appeal. Finally, on the eve of a decision from the district court, the defendants transferred Jonathan to an acceptable community-based residence. It seems to us appropriate for the district court to conduct a hearing on the issue of causation, especially in view of the history of the *Lelsz* litigation.[30]

 Turning to the final requirement for prevailing party status, we hold that the plaintiffs' motion for injunctive relief was not frivolous. Before the most recent developments in the *Lelsz* litigation, the Savidges' motion was arguably—but not necessarily—barred by the res judicata effect of the consent decree.[31] We now know, however, that parts of that decree were invalid. Specifically, this court nullified the decree to the extent that it was based upon a *generalized* due process right "to receive treatment in the least restrictive alternative setting".[32] A decree that has been vacated or nullified by an appel-

late court cannot be given res judicata effect.[33]

In this case the Savidges sought to enforce Jonathan's *individual* due process right to treatment in a less restrictive setting than the FWSS. The expert witnesses and the Texas DMHMR employees who testified at the injunction trial agreed that a community-based home was the professionally-indicated residence for Jonathan. In *Clark v. Cohen* the Court of Appeals for the Third Circuit upheld a district court finding that:

> Clark's confinement at [a Pennsylvania institution for the retarded] since at least 1976 in the face of unanimous professional opinion that she should be placed in a far less restrictive environment violated her substantive liberty right to appropriate treatment.[34]

Similarly, Dr. Gant's recommendation of a program that would rectify the harms she believed were being done to Jonathan by residence in the FWSS is broadly analogous to the "discrete recommendation" that was carried out in *Thomas S. v. Morrow.*[35] Significantly, the *Lelsz* panel distinguished *Clark* and *Thomas S.* as cases

---

**30.** On remand, the district court should consider allowing the plaintiffs limited discovery on the issue of causation. Depending on the nature of the evidence in conflict, the district court may consider whether to hold a hearing with witnesses.

**31.** In *Johnson v. McKaskle* we reaffirmed the principle that "the doctrine of res judicata [does] not 'bar a suit based on acts of the defendant that have occurred subsequent to the final judgment asserted as a bar'". 727 F.2d at 500 (quoting *Blair v. City of Greenville*, 649 F.2d 365, 368 (5th Cir.1981)). It is important to remember that res judicata is measured by the underlying transactions or occurrences at issue, and not by the relief that the plaintiff is seeking. In this case, most of the injuries to Jonathan discussed at the injunction hearing occurred *after* the filing of the *Lelsz* consent decree. *See, e.g.,* Transcript of the Injunction Hearing at 48 (12/7/83: "scratches on back and right shoulder"; 12/12/83: "long red scraped area on left upper arm ..."; 12/13/83: "scratches on left side of neck"). The relationship between these and dozens of similar injuries and the events that gave rise to the *Lelsz* litigation presents a series of difficult questions that we need not address in this opinion. We merely note that Savidge's membership in the *Lelsz* class does not, by itself, bar him from seeking injunctive

relief that is within the scope of the *Lelsz* decree. *See Johnson v. McKaskle*, 727 F.2d at 501.

**32.** *Lelsz v. Kavanaugh*, 807 F.2d at 1249.

**33.** *See Quarles v. Sager*, 687 F.2d 344, 346 (11th Cir.1982); *see generally* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4427 (1981). To the extent that a "nullified" order may be distinguishable from a vacated order, we note that *Bradford v. Bronner*, 665 F.2d 680, 682 (5th Cir.1982) and *Stevenson v. International Paper Co.*, 516 F.2d 103, 109 (5th Cir.1975) repudiate the earlier rule that gave preclusive effect to district court orders entered without subject matter jurisdiction. In other words, even if the *Lelsz* decree once had "life" as an adjudication of Savidge's right to live in the least restrictive alternative setting, because the *Lelsz* district court lacked subject matter jurisdiction to make this determination, as we implicitly held at 807 F.2d 1252, the *Lelsz* decree cannot now bind Savidge on this issue.

**34.** 794 F.2d 79, 87 (3d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986).

**35.** 781 F.2d 367, 375–76 (4th Cir.), *cert. denied,* 476 U.S. 1124, 106 S.Ct. 1992, 90 L.Ed.2d 673 (1986).

involving *individual* retardates.[36]

The Savidges' motion for injunctive relief would have affected only Jonathan. We need not decide whether the motion was ultimately meritorious;[37] we do conclude, however, that it was not "frivolous or groundless".[38]

To summarize, the plaintiffs have achieved what they sought when they filed their motion for injunctive relief. We have determined that their claim to this relief was not frivolous, or barred by res judicata. Finally, we reverse the district court's ruling on causation and remand this issue for discovery, briefing, and a finding on whether the pendency of the plaintiffs' motion was a significant factor in the defendants' decision last year to transfer Jonathan Savidge to a group home. If the plaintiffs can establish this causal nexus, they are prevailing parties and presumptively entitled to attorney's fees under 42 U.S.C. § 1988.

### III. QUALIFIED IMMUNITY

We now turn to the district court's decision to dismiss the Savidges' claim for damages against the four individual defendants. Jaylon Fincannon is a former superintendent of the FWSS. Defendants Buchanan, Read, and Chavez are former FWSS doctors who were at various times responsible for Jonathan's personal and medical care. We do not doubt that these defendants come within the scope of qualified official immunity doctrine.[39] The main question we must decide, then, is whether their conduct, as alleged in the Savidges' complaint, "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known".[40]

The defendants' argument in support of the dismissal contains two distinct strands. First, the defendants maintain that the complaint does not properly allege that Jonathan's constitutional rights were violated.[41] Second, the defendants assert that even if their conduct violated Jonathan's rights, in the years covered by the complaint the governing law was not "clearly established".

■ The defendants' first line of argument is without merit. The complaint alleges that the defendants' conduct violated Jonathan's right to a reasonably safe physical environment.[42] In *Youngberg v. Romeo*, the Supreme Court recognized that an institutionalized retarded person has a liberty interest in "personal security" as well as a right to "freedom from bodily restraint".[43] These are interests, the Court added, "that involuntary commitment proceedings do not extinguish".[44] The plain-

**36.** 807 F.2d at 1249 n. 9.

**37.** *See Garcia v. Guerra*, 744 F.2d at 1166 (Randall, J., concurring). The plaintiffs' right to an injunction would depend upon credibility issues that we are in no position to resolve.

**38.** See note 23 and the accompanying text.

**39.** At one time we might have faced the question whether the defendants' responsibilities were sufficiently "discretionary" to warrant the full protection of qualified immunity doctrine. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (immunity applies to "government officials performing discretionary functions"). But the Supreme Court has recently announced its unwillingness "to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of various officials' duties ...". *Anderson v. Creighton*, — U.S. —, — —, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523, 532–33 (1987).

**40.** *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738.

**41.** This argument boils down to an assertion that the plaintiffs have not stated a claim upon which relief can be granted. Of course, *any* dismissal can be justified on this ground. Fed. R.Civ.P. 12(b)(6). We note that in defending a favorable judgment on appeal a party is not limited to the rationale used by the district court. *Southwestern Natural Gas Co. v. Pontchartrain Materials, Inc.*, 711 F.2d 1251 (5th Cir. 1983).

**42.** *Youngberg v. Romeo*, 457 U.S. 307, 327, 102 S.Ct. 2452, 2464, 73 L.Ed.2d 28 (1982). The defendants have not offered a medical or even a financial justification for the health-threatening conditions described in the complaint.

**43.** 457 U.S. at 315–16, 102 S.Ct. at 2458.

**44.** *Id.* This language plainly suggests that Savidge has liberty interests even though he was not institutionalized through formal commitment proceedings. *See A.R.C. of North Dakota v. Olson*, 561 F.Supp. 473, 485 (D.N.D.1982), *modified on other grounds*, 713 F.2d 1384 (8th

tiffs have adequately alleged that each individual defendant knowingly deprived Jonathan of his right to minimally adequate shelter and medical care.[45]

The defendants' possible entitlement to official immunity presents a somewhat closer question. Ultimately, however, we reject their grudging interpretation of the development of constitutional safeguards for the retarded. At a national level it may be true that the right to affirmative "habilitation" described by the Third Circuit in *Romeo v. Youngberg* was, at least until recently, a spectre in "the twilight area of developing law ...".[46] Yet the Supreme Court in its opinion endorsed the observation, made in 1980 at about the time Savidge first entered the FWSS, that "a constitutional right to minimally adequate care and treatment ... is no longer a novel proposition".[47]

In the circuit courts, the concept of a constitutional right to treatment can be traced back as far as *Rouse v. Cameron.*[48] In this circuit, the right of civilly committed retardates to "such individual treatment as will help ... them to be cured or to improve [their] mental condition" is at least as old as *Wyatt v. Aderholt.*[49] In that case we also affirmed the plaintiffs' right to a "humane" and presumably safe environment.[50] *Wyatt* survives *Lelsz;* it was certainly good law in the early 1980's when most of the damage that the plaintiffs allege in this case took place.[51]

The defendants contend that *Wyatt,* unlike *Youngberg,* depends in its reasoning upon the state's participation in a formal civil commitment proceeding.[52] This observation, though arguably correct, must not be allowed to obscure the fact that as a general matter the duty to provide institutionalized retardates with constitutionally adequate care was firmly established in this circuit by 1980.[53] We reject any ap-

Cir.1983). The *Olson* court noted that if "voluntarily" committed retardates had no fourteenth amendment rights, as the defendants in the present case insist, "then the state arguably could chain confined residents to their beds and administer wanton physical beatings without violating the constitution". *Id.* In fact, Savidge's confinement at the FWSS was no more "voluntary" than Romeo's confinement at Pennhurst. *Compare* Transcript of the Injunction Hearing at 354–56 *with Youngberg,* 457 U.S. at 309 n. 2, 102 S.Ct. at 2455 n. 2. We reject the defendants' efforts to distinguish *Youngberg* from the present case on "voluntariness" grounds.

**45.** As the complaint makes sufficiently clear, the plaintiffs' section 1983 claims are *not* based on negligence or respondeat superior liability.

**46.** *Romeo v. Youngberg,* 644 F.2d 147, 154 (3d Cir.1980) (en banc). Although the Supreme Court left the issue open, some observers now see a consensus among lower courts in favor of a "right to habilitation". *Clark v. Cohen,* 794 F.2d at 93 (Becker, J., concurring).

**47.** *Youngberg v. Romeo,* 457 U.S. at 318–19, 102 S.Ct. at 2459.

**48.** 373 F.2d 451 (D.C.Cir.1966). *Rouse* held that an institutionalized mental patient was constitutionally entitled to "treatment which is adequate in light of present knowledge". *Id.* at 456. We do not suggest that the defendants in this case were directly bound by *Rouse.*

**49.** 503 F.2d 1305, 1312 (5th Cir.1974). *See also Donaldson v. O'Connor,* 493 F.2d 507 (5th Cir.

1974), *vacated on other grounds,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

**50.** *Wyatt,* 503 F.2d at 1313.

**51.** At the very least, the plaintiffs' right to a reasonably safe and minimally "humane" environment remains unaffected by *Lelsz.* We are unpersuaded by the defendants' effort to use *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396, to "cast doubt" upon the precedential value of *Wyatt.* We note that *Wyatt* was cited approvingly in Justice Blackmun's concurrence in *Youngberg v. Romeo,* 457 U.S. at 325 n. 1, 102 S.Ct. at 2463 n. 1 (Blackmun, J., concurring).

**52.** This is certainly true of the *"quid pro quo"* rationale, *Wyatt* at 1312; it is less clear with respect to the *"parens partiae"* rationale. *Id. See generally Clark v. Cohen,* 794 F.2d at 93–95 (Becker, J., concurring).

**53.** In *Anderson v. Creighton* the Supreme Court observed that whether a rule is "clearly established" for official immunity purposes "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified". —— U.S. at ——, 107 S.Ct. at 3038, 97 L.Ed.2d at 530. The *Anderson* case rejected a formulation of the duties of a police officer that was too general. In the present case, by contrast, the defendants have interpreted the controlling case law in this circuit in a way that is too particularized and narrow. Like the *Anderson* Court, of course, we seek to maintain

proach to immunity doctrine that requires us to imagine the defendants saying to themselves, "We can safely give Jonathan Savidge inadequate treatment; he was not committed to the FWSS through formal judicial proceedings and so the rationale in *Wyatt* may not apply to him".[54] We simply do not envision reasonable doctors and administrators calibrating their responsibility to each child on the basis of such narrow distinctions.[55] If the allegations in the plaintiffs' complaint are true, and they must be accepted as true, the individual defendants should have known that they were treating Jonathan Savidge in an unconstitutional manner.

## IV. CONCLUSION

We conclude that the plaintiffs have adequately stated a claim against the individual defendants under 42 U.S.C. § 1983. We also find that the defendants are not entitled to official immunity. We therefore REVERSE the district court's decision to dismiss the plaintiffs' claim for damages, and we REMAND the case for further proceedings consistent with this opinion. Because the case no longer depends in any way upon the location or the outcome of the *Lelsz* litigation, we trust that the parties will cooperate with the district court in

a "balance ... between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties". *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984).

**54.** The immunity doctrine is not divorced from common sense. At least one court has pointed out that "it is unrealistic to assume that officials are likely even aware of the legal reasoning behind applicable precedents". *Sourbeer v. Robinson,* 791 F.2d 1094, 1104 (3d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987). We are charged with deciding whether the legal obligations that ran from the defendants to Jonathan Savidge were so "unsettled" as to be, in effect, unenforceable.

In the recent case of *Jefferson v. Ysleta Independent School District* we denied immunity to a school teacher who had tied one of her pupils to a chair. 817 F.2d 303 (5th Cir.1987). Despite the difficult issues left unresolved by *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed. 2d 711 (1977), and the acknowledged absence of "a precedent which is factually on all fours with the case at bar", Judge Politz quite properly ruled that:

a speedier progress toward a final resolution of this dispute than the last three years have seen.

GEE, Circuit Judge, concurring in part and, in part, dissenting:

Concurring in the remainder of the Court's opinion, I find myself unable to join in its sweeping and preemptive treatment of the chief qualified immunity issue presented. As the Court notes, the question is whether the defendant's alleged conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[1] And as the Court likewise notes, it was "in the early 1980's when most of the damage that the plaintiffs allege in this case took place." Op. at 1511, at 908. In fact, as the opinion makes plain, most of the damage had occurred by "early 1981." Op. at 1502, at 901.

Yet it was not until *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed. 2d 28 was handed down a year and some months later in June 1982, that the rights which the defendants are claimed to have violated became "clearly established."

in January 1985, a competent teacher knew or should have known that to tie a second grade student to a chair for an entire school day and for a substantial portion of a second day, as an educational exercise ... was constitutionally impermissible.

817 F.2d at 305.

**55.** *Cf. Sourbeer v. Robinson,* 791 F.2d at 1103–04. In resolving the official immunity issue in a case brought by an *unsentenced* inmate, the *Sourbeer* court rejected the defendants' attempt to distinguish a line of cases protecting the procedural rights of *sentenced* inmates. The court concluded that:

"[a] reasonable official should not fail to respect a person's constitutional rights because the rationale behind the cases establishing those rights may be faulty".

*Id.* at 1104.

**1.** Op. at 1509, at 907. Of course, the factual issue whether any defendant was guilty of such conduct as is charged remains open on the remand ordered by the court.

Those rights arise under the Fourteenth Amendment and, as the majority in *Youngberg* observed, "[w]e consider here *for the first time* the substantive rights of involuntarily committed persons under the Fourteenth Amendment to the Constitution." *Youngberg*, 457 U.S. at 314, 102 S.Ct. at 2457 (emphasis added). Indeed, the question whether such rights existed was so entirely unsettled at the time of the injuries alleged here that it was not even clear whether the rights asserted for Jonathan arose under the Fourteenth Amendment or under the Eighth; and the trial court in *Youngberg* was reversed for having instructed the jury on an *Eighth* Amendment liability standard. 457 U.S. at 325, 102 S.Ct. at 2463. Nor do I see how such a (then) novel extension of Due Process rights as this one, which had been recognized to one degree or another in some circuits and not at all in others, can fairly be said to have been "clearly established" even before the Supreme Court had considered it for the first time.

Succour to the injured is well and very well; but something is due also to the harried administrator, perhaps seeking to do much with little, unable—as are we—to deal in absolutes, sometimes constrained to limit himself to doing no more than what the law demands because he lacks resources to do more. These defendants may have been such people; the meager record does not say. Nor does it say that they were not; and I think the Court acts unjustly in holding them to a standard which, by hindsight, the majority now calls "clearly established." It is not so: where even the *provenance* of the claimed rights was not settled—let alone their scope and reach—at the time they were allegedly violated by these defendants, they cannot fairly be characterized as clearly established.[2] I concede that the meaning of "clearly established" is not yet clearly established; but the ring of the whole phrase—"clearly established ... rights of which a reasonable person would have known"—imports to me legal rights so clearly settled and

defined that knowledge of their existence is a commonplace among the educated and a failure to recognize them implies their wilful disregard. Clearly these rights were not such before *Youngberg*, and I therefore respectfully dissent.

---

2. At most, it seems to me, the issue should be remanded to the trial court with instructions to determine the proportional amount of whatever

damages may eventually be found that accrued after *Youngberg* became final.