**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-40488

_____


JIM MORRIS, Individually and as Next Friend of
Hilary Faith Morris, a Minor; GLORIA MORRIS,
Individually and as Next Friend of
Hilary Faith Morris, a Minor,

Plaintiffs-Appellees,


VERSUS


CHARLOTTE HAWKINS DEARBORNE, ET AL.,

Defendants,

CHARLOTTE HAWKINS DEARBORNE, Individually
and in her official capacity as a Teacher for
Whitehouse Independent School District,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Eastern District of Texas
_____

July 16, 1999


Before JOLLY, WIENER, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Plaintiffs Jim and Gloria Morris, individually and on behalf

1

of their minor daughter, Hilary Faith Morris,[1] brought suit against defendants for separating the family for a period of three years during an investigation of possible child abuse. Appellant Charlotte Hawkins Dearborne ("Dearborne") brings this interlocutory appeal challenging the district court's denial of her motion for summary judgment based on qualified and statutory immunity in reporting possible abuse of Hilary, who was one of her students. We affirm in part, reverse in part, and remand this case to the district court for further proceedings.

## I. **FACTUAL & PROCEDURAL BACKGROUND**

Because this is an interlocutory appeal from a denial of summary judgment, the following recitation of facts accepts the Plaintiffs' evidence and reasonable inferences drawn from it as true and should not be construed as expressing any view as to the weight or credibility of their evidence. *See Salas v. Carpenter*, 980 F.2d 299, 304 n.3 (5th Cir. 1992).

In September 1992, Jim and Gloria Morris enrolled their four-year old daughter, Hilary, at Cain Elementary School in the Whitehouse Independent School District ("WISD") for the purpose of obtaining speech therapy for the child. Hilary had been diagnosed as having elective mutism; she was able to speak, but refused to do so. The child had been receiving treatment for this condition at

---

[1]The child plaintiff's name is spelled "Hillary" and "Hilary" in the briefs and record. We will refer to her in this opinion as "Hilary."

2

the firm of Counseling, Testing, and Psychological Services ("CTPS"). On September 16, 1992, without the parents' permission or knowledge, the child's teacher, Appellant Dearborne, had Hilary use a machine called a Facilitative Communicator ("FC"), a device not unlike a word processor, following a routine known as Facilitated Communication.[2] In this process, a person known as a "facilitator" supports the arm of a developmentally disabled or mechanically deficient individual so as to allow that individual to type. The process was known to be highly controversial at the time, in large part because of the obvious fear, borne out by numerous studies, that the facilitator, and not the typist, would control the output.[3] Furthermore, the Plaintiffs allege that the machine, and the technique, about which Dearborne had received one day of training, is not to be utilized with children as young as

---

[2]Facilitated Communication, the process, and a Facilitative Communicator, the machine used in the process, will both be referred to interchangeably as "FC."

[3]See *Callahan v. Lancaster-Lebanon Intermediate Unit 13*, 880 F. Supp. 319 n.14 (E.D. Pa. 1994), for a thorough collection of sources regarding FC, including the following policy statement issued by the American Academy of Child and Adolescent Psychiatry, October 20, 1993:

Facilitated Communication (FC) is a process by which a "facilitator" supports the hand or arm of a communicatively impaired individual while using a keyboard or typing device. It has been claimed that this process enables persons with autism or mental retardation to communicate. Studies have repeatedly demonstrated that FC is not a scientifically valid technique for individuals with autism or mental retardation. In particular, information obtained via FC should not be used to confirm or deny allegations of abuse or to make diagnostic or treatment decisions.

the plaintiff child or with children who have the mechanical ability to type on their own. The device serves no purpose when used with individuals who are not yet literate.

During the initial session with Hilary, which was also Dearborne's first attempt to use FC with a student, Dearborne guided Hilary's hand to type a printout containing allegations of sexual abuse against her parents. At that time, Hilary could not read or write, and did not even know all the letters of the alphabet. While the teacher guided the child's hand, a number of sexually explicit and graphically violent phrases were typed.

As the only method used to test the accuracy and reliability of the FC process, Dearborne asked Hilary to type the words "LAUREN IS YOUR DAUGHTER."[4] With Dearborne assisting in typing, Hilary typed the sentence with correct spelling, "in a flash." Although Dearborne was familiar with double-blind studies[5] and the risk of facilitator influence, she conducted no reliable test to determine her own influence on the output, stating that she was too busy to conduct such tests.

Dearborne and WISD contacted the Texas Department of Protective & Regulatory Services ("TDPRS"), but not the plaintiff parents, about the alleged sexual abuse of Hilary. The following

---

[4]The FC machine only printed in uppercased letters without punctuation.

[5]Double blind studies in the FC context involve the facilitator looking away from the screen during the process to help rule out facilitator influence.

day, September 17, 1992, an employee of TDPRS and a sheriff's deputy came to Dearborne's classroom. They interviewed the child and observed an FC session, during which it was abundantly clear that Dearborne was producing the messages. Plaintiffs allege that defendants below were incompetent to operate the machine, and that the session was guided by a desire to achieve the result sought by the defendants. The session produced a printout that again implicated the parents, using compound predicates and correctly spelled anatomical terms for genitalia.

On the basis of these readouts, the child was removed from her parents' custody, and TDPRS initiated a suit to permanently terminate parental rights. Examinations by two physicians revealed no evidence of sexual abuse. TDPRS then contracted with CTPS to provide therapy for the child and to further test the allegations. Plaintiffs recount that, for eight months, the minor Plaintiff was exposed to explicit sexual language and behavior, and that this treatment was only terminated by reason of the Plaintiffs' insistent and persevering efforts.

Also, during this time, from September 1992, until May 1993, against the instructions of the TDPRS officer involved in Hilary's case, the child's foster parent, and Karen Goforth (a counselor at CTPS), Dearborne continued to conduct FC sessions with the child, during which graphic themes of sexual conduct and violence were explored. The child was seated on Dearborne's lap during at least one session. One session had the four-year-old child, who could

5

spell only her own name, and that only with assistance, writing the complex phrase, "JACK EQUALS JIM." In another, the child supposedly wrote, "ALWAYS BELIEVE ME ALWAYS." When Dearborne suggested to the child that it would be good if they typed every day, the child reportedly typed, "YES IT WOULD I WANT TO TELL ABOUT JIM BUT THE WORDX [sic] WONT COME OUT." With Dearborne's guidance, the child wrote, "PENIS," "VAGINA," "F****ED," "SCARED," and the phrases, "SON OF A BITCH," "AM I CRAZY," and "SICK IN MYT [sic] SOUL ALWZAYS [sic] FRIGHTENED." The sessions also included matter showing that the child had multiple identities, one of whom was referred to as "JEZIBEL." This reference was not the sole religious item explored. Once when the child purportedly typed, "SAID A PRAYWER [sic] FOR MYSELF," Dearborne responded, "GOD GIVES COMFORT AND SAFETY. I HAVE SAID LOTS OF PRAYERS FOR YOU." Under the teacher's guidance, the four-year old supposedly answered, "THANK YOU ALSIO [sic] FOR SAVING MY LIFE." Despite the mandates to stop, Dearborne conducted a total of eight sessions with the child. She also contacted the child's foster parent, urging that they do everything possible to ensure that the child not be returned to her parents.

Others attempted to conduct FC with Hilary but attained no results. Once when the child typed, "MGXAEER," she told Karen Goforth that it spelled, "Momma, I love you." When showed anatomical correct figures of the human body during a session at CTPS, Hilary only referred to the male's genitalia as a "dangy" and

6

the female's as a "yah." Only Dearborne could produce any legible results from the FC, and only Dearborne with the help of FC could get the child to use anatomically correct sexual terms. During another of the sessions, it was observed that the child was not looking at the keyboard while she typed, and that the output would change when Dearborne was not looking at the screen. It was also noted that Dearborne was supporting the child's wrist and erasing letters allegedly typed by the child. Those observing the pre-schooler within the few months after she was taken from her parents noted that she could not read. Polly Yeager, a relative of Plaintiff Gloria Morris, informed WISD Superintendent, Marshall Neill, as early as October 1992, that the child could not read or write the messages attributed to her. Yeager presented Neill with a writing sample, in which the child was barely able to write her own name. Additionally, Hilary had no motor skill defect that required her to be assisted in typing. Despite this, and despite WISD's policy that the FC was not to be used on children without motor skill deficiencies, WISD, through Neill, chose to do virtually nothing. By reason of the further efforts of Dearborne, WISD, and the TDPRS, the Plaintiffs lost custody of their daughter for a period of almost three years.

Plaintiff Jim Morris was precluded from having any contact with his daughter until September 6, 1995, a period of approximately 36 months. In the meantime, Plaintiff Gloria Morris was allowed supervised visits with her daughter. TDPRS finally

allowed the child to return home and dismissed the termination suit without prejudice. The agency continues to maintain that the plaintiff parents molested their child, and the family remains under TDPRS supervision. Plaintiff Jim Morris lost his job as a juvenile detention officer because of the accusations and Plaintiffs maintain that the charges of abuse destroyed their marriage.

Following return of their child, Plaintiffs filed the action below alleging, pursuant to 42 U.S.C. § 1983, deprivations of procedural and substantive due process rights, sexual harassment under Title IX, 20 U.S.C. § 1681, *et seq.*, violations of the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, negligence, and intentional torts.

Dearborne moved for summary judgment and dismissal of Plaintiffs' suit for failure to state a claim upon which relief can be granted. *See* FED.R.CIV.P. 56; 12(b)(6). In her motion she asserted the affirmative defenses of qualified immunity, statutory immunity, and the statute of limitations, as well as challenged the evidentiary and legal bases of claims made by Plaintiffs under Title IX and the IDEA.

The district court granted Dearborne's motion for summary judgment as to Plaintiff's Title IX claims, but denied it as to all other claims. Dearborne contends that the district court erred in not granting her motion as to all of Plaintiffs' claims and now

8

brings the instant appeal.

## II.  Jurisdiction and Standard of Review

At the outset, we note that we have jurisdiction over this appeal to the extent that it turns upon questions of law and not of fact.  *See Johnson v. Jones*, 515 U.S. 304, 310-12 (1995); *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *Hassan v. Lubbock Indep. School Dist.*, 55 F.3d 1075, 1078 (5th Cir. 1995).  We review the district court's denial of summary judgment *de novo*, applying the same standard as the district court.  *See Hassan*, 55 F.3d at 1079.  Summary judgment is appropriate only if the record viewed in the light most favorable to the non-movant discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law".  FED.R.CIV.P. 56(c);  *see id.*

## III. DISCUSSION

### A.  Plaintiffs' Claims under 42 U.S.C. § 1983

The Plaintiffs brought claims pursuant to 42 U.S.C. § 1983 alleging that Dearborne violated their substantive due process rights to maintain family integrity and Hilary's right to be free from sexual harassment, as well as their procedural due process right to be consulted prior to the use of FC in Hilary's individualized educational program.  Dearborne asserts that she is entitled to qualified immunity on Plaintiffs' due process claims, and that the district court erred in not granting her summary

9

judgment on that basis.

As a general rule, government officials performing discretionary functions are entitled to qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified, or "good faith" immunity, shields officials from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *See id.* Whether an official generally protected by qualified immunity may be held personally liable for an allegedly unlawful action turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)(quoting *Harlow*, 457 U.S. at 818-819).

As a threshold matter, in assessing a claim of qualified immunity, we engage in a three-part analysis.[6] The first inquiry is whether the plaintiffs have asserted a violation of a constitutional right at all. *See Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *Rankin v. Klevenhagen*, 5 F.3d 103, 105 (5th Cir. 1993). Secondly, in analyzing the specific conduct at issue, we must determine whether the constitutional right was clearly established

---

[6]Liability under § 1983 also requires a showing that the alleged deprivation of a constitutional right was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). The parties do not dispute that Dearborne's actions, made the subject of this suit, were taken under color of state law.

10

at the time the defendant acted. *See Siegert*, 500 U.S. at 232. If the law was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could she fairly be said to "know" that the law forbade conduct not previously identified as unlawful. However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *See Anderson*, 483 U.S. at 640 (internal citations omitted). We have also noted that the term "clearly established" does not necessarily refer to commanding precedent that is factually on all-fours with the case at bar or that holds that the very action in question is unlawful. *See Jefferson v. Ysleta Indep. School Dist.*, 817 F.2d 303, 305 (5th Cir. 1987). The constitutional right is clearly established if the unlawfulness of the conduct would be apparent to a reasonably competent official. *See Doe v. Taylor Indep. School Dist.*, 15 F.3d 443, 455 (5th Cir. 1994)(en banc). "Further, the applicable law that binds the conduct of officeholders must be clearly established at the very moment that the allegedly actionable conduct was taken." *Stem v. Ahearn*, 908 F.2d 1, 5 (5th Cir. 1990). Courts cannot use the luxury of hindsight to support a finding of unreasonableness in light of case law published after the acts in question took place. *See Stem,* 908 F.2d at 5; *see also Harlow*, 457

11

U.S. at 818. Finally, "we must determine whether the record shows that the violation occurred, or at least gives rise to a genuine issue of material fact as to whether the defendant acutally engaged in the conduct that violated the clearly-established right." *Kerr v. Lyford*, 171 F.3d 330, 339 (5th Cir. 1999)(quotation and citation omitted). This third prong is not in issue, as Dearborne does not challenge on appeal the core facts pleaded by Plaintiffs – her role in the use of the FC, the contents of the FC printouts, or the resulting removal of Hilary from her home.

If we find that the official's conduct violated clearly established law, we then consider whether the conduct was objectively unreasonable. *See Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1993).

Dearborne contends that she is entitled to qualified immunity because her actions did not violate clearly established law and that her actions were objectively reasonable under the circumstances. Accordingly, we will now consider her contention that the district court erred in not granting her qualified immunity from Plaintiffs' due process claims.

**1. The Right to Bodily Integrity and Freedom From Sexual Harassment**

Plaintiffs claim that Hilary's substantive due process right to bodily integrity and her right to be free of sexual harassment were violated by Dearborne. The district court denied Dearborne's

12

motion for summary judgment on these claims, finding that the child's bodily integrity was implicated by the FC sessions during which she was seated on her teacher's lap, her hand was guided by her teacher and she was exposed to vulgar and threatening messages. Dearborne challenges this holding, arguing that the touching alleged was innocuous and that, according to the Plaintiffs' version of the facts, Hilary did not understand the messages.

Plaintiffs liken Hilary's treatment to that of a child who was sexually molested by a teacher in *Doe v. Taylor Indep. School Dist.*, 15 F.3d 443 (5th Cir. 1994), or a child who was lashed to a chair for two days in *Jefferson v. Ysleta Indep. School Dist.*, 817 F.2d 303 (5th Cir. 1987). However, these cases are so far removed factually from the circumstances of the case at bar that they do not inform our decision. Both *Doe* and *Jefferson* involved interference with a child's physical well being that posed a grave risk of damage. Sitting on a teacher's lap, typing messages that are incomprehensible does not pose such a threat. There is no basis in logic or precedent for the proposition that the constitutional protection of bodily integrity and freedom from sexual harassment prohibit a teacher from holding a preschool child in her lap, guiding her arm or typing words that the child does not understand. There is no constitutional prohibition to such contact between a teacher and a young child. We therefore find that Dearborne is entitled to qualified immunity from Plaintiffs' claims

based on violation of Hilary's right to bodily integrity and her right to be free of sexual harassment.

**2.  The Right to Family Integrity**

It is clear, and Dearborne does not dispute, that the constitution protects the right to family integrity.  Twenty years before Dearborne's involvement with the Plaintiffs, the Supreme Court recognized that the right to family integrity is a form of liberty guaranteed by the due process clause of the Fourteenth Amendment.  *See Stanley v. Illinois*, 405 U.S. 645 (1972).  In *Stanley,* the Supreme Court stated that:

> The Court has frequently emphasized the importance of the family.  The rights to conceive and to raise one's children have been deemed essential, . . . basic civil rights of man, . . . and rights far more precious than property rights.  It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.  The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment . . . ."

*Id.* at 651 (internal citations and quotations omitted).  Similarly, in *Hodorowski v. Ray*, this circuit recognized the "most essential and basic aspect of familial privacy--the right of the family to remain together without the coercive interference of the awesome power of the state."  844 F.2d 1210, 1216 (5th Cir. 1988)(quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2nd Cir. 1977)).  In a case decided just two years prior to the incidents alleged by Plaintiffs in this case, we considered whether a public school

14

employee's decision to send her daughter to private school was afforded protection by the constitution. *See Fyfe v. Curlee*, 902 F.2d 401, 403 (5th Cir. 1990).

> We have no doubt that conduct such as Mrs. Fyfe's in transferring her daughter to private school enjoys constitutional protection. In *Brantley v. Surles*, 718 F.2d 1354 (5th Cir. 1983), a public school cafeteria worker was discharged, allegedly because her son attended a private academy rather than the local public school. *Brantley* reinforced the Supreme Court's longstanding recognition that the Constitution protects familial relationships and practices, and that "[t]he parental interest in direction and control of a child's education is central to the family's constitutionally protected privacy rights." *Brantley,* 718 F. 2d at 1358*, citing Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L.Ed. 1042 (1923). Mrs. Fyfe's decision to send her child to a private school was protected under the First Amendment and the penumbra of familial privacy rights recognized by the Supreme Court.

*Id*. at 403. This reaffirmation leaves no doubt concerning the existence of constitutional protection for families in 1992-93. In sum, Plaintiffs have alleged a violation of the right to family integrity which is clearly protected by the Constitution.

**3. Substantive due process violations that shock the conscience**

The district court held that even if the violations asserted were not cognizable under a family rights theory, they would offend Plaintiffs' substantive due process rights because, if proven, they rise to "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). The district court found that Dearborne's alleged conduct would result in grave harm, and, when

15

coupled with proof of a culpable intent, would violate the due process clause because it violates "those cannons of decency and fairness which express the notions of justice of the English-speaking peoples." *Malinski v. New York*, 324 U.S. 401, 416-17 (1945).

Dearborne challenges the district court's ruling on conscience-shocking substantive due process by stating that a teacher holding a preschool child on her lap and guiding her arm does not shock the conscience. Further, she argues that taking custody of a child to protect that child from harm likewise does not shock the conscience. By assuming, for the purposes of this appeal, facts different than those alleged in Plaintiffs' complaint, Dearborne's argument fails to inform the question of whether the district court's shocks-the-conscience ruling is legally correct.

When the district court ruled, it did not have the benefit of *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708 (1998), the Supreme Court's latest application of the shocks-the-conscience standard to a § 1983 claim of substantive due process violation arising out of a death following a highspeed police chase. *Lewis* reminds us that "the touchstone of due process is protection of the individual against arbitrary action of government." *Id.* at 1716. "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense."

16

*Id.*(quotations omitted.) *Lewis* sets out the threshold question: "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 118 S. Ct. at 1717 n.8. If this standard is met, a court must next determine whether there exist historical examples of recognition of the claimed liberty protection at some appropriate level of specificity. *See id.* Because the Supreme Court determined that the official conduct at issue in *Lewis* did not shock the conscience, it provides no further illumination of this final step in the analysis.

Following *Lewis*, we have held that "a plaintiff whose claim is not susceptible to proper analysis with reference to a specific constitutional right may still state a claim under § 1983 for a violation of his or her Fourteenth Amendment substantive due process right, and have the claim judged by the constitutional standard which governs that right." *Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir. 1998). "[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression." *Collins v. City Harker Heights, Texas*, 503 U.S. 106, 126 (1992)(quotation omitted). Once we determine whether a plaintiff's substantive due process right was violated by abusive, irrational or malicious abuse of government power that shocks the conscience, we must assess what clearly established legal standards governed the

defendant's actions at the time of the incident at issue. *See Petta* at 901-03.

Applying *Lewis* and *Petta* to the case at bar, we conclude that the district court was correct in holding that a teacher's fabrication of sexual abuse against a student's father shocks the contemporary conscience. In effect, Plaintiffs maintain that Dearborne utilized the highly controversial FC device as a tool for concocting her story of child abuse. The device was never intended to be used on a four-year-old child who could neither read nor write, who did not know all of the alphabet and who had no physical impairment. To contend that when such a child was placed on Dearborne's lap in front of the facilitator with Dearborne guiding her hand, she somehow became transformed into a literate person possessed with a rich vocabulary and the ability to express understanding of complex sexual and religious concepts not only defies human experience, it reveals the truth of what was really transpiring. Based on the summary judgment evidence in this record, a rational jury could conclude that the typed words were Dearborne's, not Hilary's and that they revealed the content of Dearborne's mind, not the life experiences of the child. Such behavior is an abusive, irrational, malicious, and oppressive use of governmental power. It is beyond purview that any rational teacher could believe that governmental destruction of a family based on fabricated evidence is constitutionally allowed. *See*

18

*Stanley*, 405 U.S. at 651.

## 4. Were Plaintiffs' rights clearly established?

Having determined that Plaintiffs have alleged a deprivation of constitutional rights, we must next consider whether those rights were clearly established at the time of Dearborne's conduct. *See Lewis*, 118 S. Ct. at 1714 n.5 (1998).

Although constitutionally protected, the rights to family integrity and to be free of conscience-shocking governmental action are not absolute or unqualified. *See Lehr v. Robertson*, 463 U.S. 248, 256, 103 S.Ct. 2985, 2990-91 (1983)(holding that the relationship between a parent and child merits constitutional protection in "appropriate cases"). States can adopt necessary policies to protect the health, safety, and welfare of children. *See Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)("the family itself is not beyond regulation in the public interest"). Where a parent has mistreated a child, the state may intervene to protect the child, including, when necessary, separating the child from the parents or even permanently terminating the parent-child relationship. *See Stanley*, 405 U.S. at 652 ("We do not question . . . that neglectful parents may be separated from their children.")

Dearborne acknowledges that the Plaintiffs have a constitutional right to family integrity, but argues that her actions fell within the exception carved out for state actors intervening to protect a child from abuse. Alternatively, she

19

argues that the line of demarcation between the right and the exception was not sufficiently clear during 1992-93 to allow a reasonable teacher to conform her behavior to constitutional standards in the context of Hilary's case.

Dearborne's success in this appeal hinges, in large part, upon the degree of fit between the facts of this case and our opinions in *Hodorowski v. Ray*, 844 F.2d 1210 (5th Cir. 1988)*, Doe v. State of La.*, 2 F.2d 1412 (5th Cir. 1993) and *Kiser v. Garrett*, 67 F.3d 1166 (5th Cir. 1995), where we found that social workers are entitled to qualified immunity for actions taken during the course of investigating allegations of child abuse for periods of time ranging from one weekend to four months.[7]

---

[7]Although Plaintiffs' pleadings and the district court opinion discuss this issue in terms of the substantive due process right to family integrity, we note that some of the authority cited is bottomed on Procedural Due Process Clause analysis. The Fourteenth Amendment's Procedural Due Process Clause grants parents the right to fundamentally fair procedures before having their child removed their home. *See Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982). Arguably, the Plaintiffs in the case at bar were deprived of fundamentally fair procedures when Dearborne, a state actor, intentionally sought to have fraudulent evidence introduced into the procedures that the state did provide prior to the removal of Hilary from their home.

In *Hodorowski v. Ray,* 844 F.2d 1210 (5th Cir. 1988), we dealt with a Procedural Due Pocess Clause challenge, but the facts of that case did not involve any misuse of the juridicial process. Rather, the defendants had removed the children without first obtaining a court order. Further, the Procedural Due Process Clause claim in *Kiser v. Garrett*, 67 F.3d 1166, 1173-74 (5th Cir. 1995), was grounded on the state's failure to disclose exculpatory evidence, unlike Dearborne's alleged intentional abuse of the judicial process. Because the issue was not developed in the distirct court nor on appeal, and because procedural due process analysis in the cases cited by Dearborne are easily distinguishable

Dearborne relies on *Doe,* 2 F.3d 1412, for the proposition that the contours of the constitutional rights protecting family integrity were not sufficiently particularized at the time of her conduct to inform her decisions concerning the Plaintiffs' family. In *Doe,* a father sued on behalf of himself and his two minor children under § 1983 for interference with the right to family integrity, alleging that two social workers employed by the state agency charged with investigating child abuse allegations withheld exculpatory evidence and fabricated evidence which interfered with his right to the care and custody of his children during a four month investigation of an abuse report. We held that the social workers could not have known that their conduct violated the right of family integrity. *See Doe*, 2 F.3d at 1418.

Dearborne also relies on our subsequent decision in *Kiser v. Garrett*, 67 F.3d 1166 (5th Cir. 1995). In *Kiser*, a father sued social workers alleging that they violated his substantive due process right to family integrity by continuing a child abuse investigation after they had information that showed he was not the one who injured the child. Mr. Kiser's ten-week-old son was removed from his home while child welfare workers investigated several unexplained bone fractures. Mr. Kiser did not challenge

---

from the circumstances of this case, we express no opinion about any potential claim of qualified immunity from a cause of action for denial of Plaintiffs procedural due process in the state court child removal proceedings.

the constitutionality of the initial removal and investigation, but rather complained that the investigation went on too long. After four months, the child was placed with his maternal grandmother and the Kisers were allowed unlimited supervised visitation. At the end of six months, the child was returned home. Again we held that the contours of the right to family integrity were not well-defined "especially in the context of a state's taking temporary custody of a child during an investigation of possible parental abuse." *See id*. at 1173.

In deciding *Kiser*, we relied extensively on our earlier decision in *Hodorowski*, 844 F.2d 1210 (5th Cir. 1988). The Hodorowskis alleged that child protective workers violated their right to family integrity by removing children from their home for one weekend without a court order. We noted that Supreme Court jurisprudence establishing the right of family integrity had been formulated in the context of state attempts to permanently terminate parental rights. *See id.* at 1217 (citing *Santowsky*, 455 U.S. at 747-48 and *Stanley*, 405 U.S. at 649). We held that the social workers could not have known that an attempt to obtain temporary custody of the Hodorowski children during an investigation of reported abuse was a violation of the right as developed in the Supreme Court termination of parental rights cases. *See Hodorowski*, 844 F.2d at 1217.

The Original Petition filed by TDPRS sought an order

appointing TDPRS temporary managing conservator of Hilary and states that "efforts will continue to return the child home and reunite the family, but if this is not possible the [the TDPRS] asks the Court to terminate the parent-child relationship between [Plaintiffs] and child. The prayer asks for temporary orders and on final hearing "such orders affecting or terminating the parent-child relationship as it finds proper." Dearborne attempts to minimize the state's termination pleadings by characterizing them as "form language" used in every petition filed by TDPRS. This argument lacks merits. It is clear from the unambiguous language of the state court pleadings that the State sought, among other remedies, to permanently terminate the Morris's parental rights.

Moreover, *Doe, Kiser* and *Hodorowski* addressed the contours of the right of family integrity vis-à-vis immunity claimed by state officials charged with investigating child abuse reports rather than teachers. Each of the defendants was a child welfare official whose primary duty was to investigate alleged instances of child abuse. All the alleged conduct on which the plaintiffs rested their claims took place after the defendants had received independent reports of child abuse. In *Hodorowski,* we grappled with the appropriate balance between independence for social workers charged with investigation of child abuse and protection for family privacy. We noted that other circuits have extended to such professionals absolute prosecutorial immunity, analogizing their function to that of executive branch officials who

23

investigate and initiate criminal prosecutions. *See Hodorowski*, 844 F.2d at 1213 (citing *Meyers v. Contra Costa County Department of Social Services*, 812 F.2d 1154 (9th Cir. 1987) and *Malachowski v. City of Keene*, 787 F.2d 704 (1st Cir. 1986)). We also recognized that some courts have afforded absolute immunity to child protective service workers for policy reasons rather than by analogy to prosecutors. *See id*. at 1215 (citing *Mazor v. Shelton,* 637 F. Supp. 330 (N.D.Cal. 1986); *Hennessey v. Washington Department of Social and Health Services,* 627 F. Supp. 137 (E.D.Wash. 1985); and *Whelehan v. County of Monroe*, 558 F. Supp. 1093 (W.D.N.Y. 1983)). However, we rejected both of those approaches, concluding that qualified, rather than absolute immunity strikes the better balance and allows for the evaluation of the motive for and reasonableness of a welfare worker's challenged actions. *See id.* at 1216.

The constitutional right to family integrity was well established in 1992. *Doe, Kiser* and *Hodorowski* were concerned with a narrow strip of cases involving child welfare investigative employees' power to temporarily, as opposed to permanently, remove children from their homes. We determined that the facts of those cases placed them close to the line between the rule – families are constitutionally entitled to be free of governmental interference in child raising decisions, and the exception – child welfare workers can take temporary custody of children about whom they have

24

received reports of abuse in order to guarantee their safety. *See Hodorowski,* 844 F.2d at 1217.

Dearborne's argument misconstrues the significance of our finding of nebulousness in *Hodorowski*-type cases. Cases claiming governmental interference with the right of family integrity are properly analyzed by placing them, on a case by case basis, along a continuum between the state's clear interest in protecting children and a family's clear interest in privacy. When the facts of a case place it in the center of the continuum where the two interests overlap and create a tension, the right to family integrity may properly be characterized as nebulous, and thus a defendant may claim the protection of qualified immunity. However, when the facts of a case place it squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court, a defendant's defense of qualified immunity, based on a claim that the right to family integrity was not clearly established, will fail.

Here, by contrast, we have neither child welfare investigators nor a temporary removal. Dearborne's primary duty is to teach, not ferret out possible instances of abuse (even though she is, of course, required to report evidence of apparent abuse). Moreover, Plaintiffs allege that Dearborne fabricated the evidence of abuse in the first instance with no prior indication from any other source that abuse had occurred. Thus, although child welfare

agents who (over)zealously follow up independent reports of child abuse may not have been on notice in 1992 that their actions violate the constitutional right of the families involved, it can certainly come as no surprise to Dearborne, a teacher, that she was not free to manufacture from whole cloth evidence of sexual abuse.

We therefore hold that Plaintiffs' claims fall squarely within the well established constitutional right to family integrity and to be free of arbitrary, oppressive governmental action. Hilary's three year stay in foster care, cut off from all contact with her father while enduring state-initiated termination proceedings does not fall within the exception, or even close to the line, that allows a state to temporarily remove a child from her home for a few days or a few months to protect her while an investigation of reported child abuse is conducted. It has been clearly established for more than twenty years that, outside of the state's intervention to promote the health and welfare of children, the integrity of a family unit is protected by the Constitution. Dearborne cannot claim that because the parameters of the investigative power of specialized child protective service professionals may have been unclear, she was unable to determine whether she was free to fabricate sexual abuse allegations against her student's parents.

### 5. Objective Reasonableness

Even if Dearborne's conduct violated a clearly established constitutional right, she is entitled to qualified immunity if the conduct was objectively reasonable. *See Spann*, 987 F.2d at 1114.

26

In short, Dearborne's alleged conduct was not objectively reasonable. In addition to being a violation of the clearly established constitutional right to family integrity, it is a criminal offense in Texas to make a child abuse report that the person knows is false. *See* TEX. FAM. CODE § 261.107 (West 1996).[8] Dearborne's citation to Texas statutes that require teachers to report suspected child abuse, Tex. Fam. Code § 261.101-102, and criminalize failure to report, Tex. Fam. Code § 261.109, are inapposite to the Plaintiffs' amply supported allegations of false reporting. Conduct that violates the United States Constitution and the state's criminal law is not objectively reasonable. Further, because a reasonable teacher could not have believed that the actions alleged in this suit promoted Hilary's health or welfare, qualified immunity arising within that exception does not benefit Dearborne. *See Jefferson,* 817 F.2d at 305 ("In determining what a reasonable teacher should know in this instance, it is not necessary to point to a precedent which is factually on all-fours with the case at bar. It suffices that the teacher be aware of general, well-developed legal principles."(footnote omitted)).

---

[8]From 1987 through 1995, the Texas statutory provision criminalizing false reports of child abuse was codified at V.T.C.A., Family Code § 34.031. The recodification of this provision in 1995 by the 74th Texas Legislature made no substantive changes relevant to our discussion.

## 6. Causation

Dearborne[9] contends that she merely reported abuse allegations, while a state court judge made the decision to remove Hilary from her home and therefore Dearborne did not cause any constitutional violations. The district court, citing *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990), stated that direct participation is not necessary for liability under § 1983. Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable. The district court held that the requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights. The district court then concluded its analysis by finding that Plaintiffs had sufficiently alleged that Dearborne was instrumental in causing the constitutional violation in issue.

We agree with the district court that in order to establish Dearborne's liability, the Plaintiffs must prove that she set in motion events that would foreseeably cause the deprivation of Plaintiffs' constitutional rights.

Dearborne argues on appeal that even assuming Plaintiffs will meet their burden on "setting in motion" and "foreseeability," they cannot satisfied the causation requirement in this case because of

---

[9]This argument is developed on appeal by the brief submitted by Amici Curiae Texas Association of School Boards, Texas Association of School Administrators, Texas Counsel of School Attorneys and Texas Classroom Teachers Association rather than by Dearborne.

the intervention of the state court's independent decision. That is, there is no genuine issue of fact concerning Dearborne's allegation that the state judge's independent decision broke the causal link between her conduct and the alleged constitutional violation. Not only does she mischaracterize the evidence in the record, the one Fifth Circuit case she relies on, *Taylor v. Gregg*, 36 F.3d 453 (5th Cir. 1994), rather than furthering her position, directly supports, indeed mandates, the district court's decision to deny Dearborne summary judgment on the issue of causation.

We begin with the obvious proposition that the question of causation is "intensely factual." *Savidge v. Fincannon*, 836 F.2d 898, 905 (5th Cir. 1988)(reversing a district court decision on causation in a § 1983 case for failure to hold an evidentiary hearing). Dearborne contends that it is undisputed that welfare officials and a state judge independently evaluated the allegations of sexual abuse, that Dearborne had no control over the ultimate disposition of the charges and that she simply reported suspected child abuse as she was required to do under Texas law. The record does not bear out her characterization of these facts as undisputed. There is evidence that Dearborne's role was not limited to that of a mere reporter of suspected abuse. She allegedly created false evidence that was presented to the state court judge and to child welfare officials in the first instance. She then continued to create false evidence after Hilary was removed from the home and any emergency had passed, in violation of specific instructions to

29

discontinue the use of FC with Hilary, in an attempt to further influence the results of the state process, thereby compromising the integrity and independence of the state proceeding.

In *Taylor v. Gregg*, 36 F.3d 453 (5th Cir. 1994), plaintiffs brought a § 1983 action against a police officer seeking damages for, *inter alia,* false arrest. Dearborne quotes that portion of the decision which states, "[i]t is well settled" that, if an "independent intermediary such as a magistrate or grand jury" makes a decision based on his independent review of the facts, the intermediary's decision "breaks the chain of causation" and insulates the initiating party from liability. *Id.* at 457. The rationale underpinning the rule is apparent, with the focus being upon the independent decision making process of a court to impartially and objectively evaluate the underlying facts and then to reach its own decision. The reliability of independent judicial decision making is of course greatly dependent upon the reliability of the information upon which it conducts its analysis. *Taylor* goes on to emphasize that "the chain of causation is broken only where all the facts are presented to the grand jury or magistrate and the malicious motive of the officer does not lead him to withhold any relevant information." *Id.* (citing *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988)). We affirmed the district court's grant of summary judgment for the defendants in *Taylor* because the summary judgment evidence did not create a genuine issue of material fact

30

concerning whether the deliberations of the intermediary were tainted by the actions of the defendants. *Taylor*, 36 F.3d at 457. Applying the lessons of *Taylor* and *Hand* to this case, we conclude that Dearborne was not entitled to summary judgment on the issue of causation. A fact issue exists regarding the extent to which (if at all) Dearborne subverted the ability of the court to conduct independent decision making by providing false information, and in so doing, withholding true information. The parties will have the opportunity at trial to develop the facts which will resolve the question of causation. The fact finder will then be able to determine the extent to which the welfare officials and the state court judge relied on Dearborne's representations and the extent to which she succeeded in her attempt to skew the proceedings.

**B.  Plaintiffs' Individuals with Disabilities Education Act Claim**

The district court denied Dearborne's motion for summary judgment on Plaintiffs' claims brought pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1401 ("IDEA"),[10] finding that alleged failures to meet IDEA's procedural requirements

---

[10]Violations of the protections guaranteed by the IDEA may be pursued through § 1983, which broadly encompasses violations of federal statutory as well as constitutional law. *See Maine v. Thiboutot*, 448 U.S. 1, 4-5 (1980). In addition, parents and children may bring a civil action pursuant to the IDEA "relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child[.]" 20 U.S.C. § 1415(b)(1)(E). Finally, Plaintiffs allege violations of their procedural due process rights stemming from the same acts and omissions that form the basis of the IDEA claim. These three causes of action succeed or fail on the same bases and are therefore considered together.

are adequate grounds for liability. Specifically, Dearborne used the FC with Hilary although it was not included in Hilary's individualized education program. According to Plaintiffs, this violated the IDEA requirement that "written prior notice to the parents or guardian" be provided whenever a school "proposes to initiate or change . . . the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(1)(C). Dearborne, while not disputing the Plaintiffs' factual allegations in this regard, contends that the IDEA does not require specific devices or methodologies to be included in individualized education programs.

In our view, both positions miss the mark. The IDEA mandates a free public education for each child and sets forth procedures designed to ensure an education that meets minimal requirements. 20 U.S.C. §§ 1412(1) & 1415(a)-(e) The use of FC does not give rise to a cause of action in this case because of some potential impact this unique technology had on Hilary's education. Rather, Plaintiffs' damages arose from the fraudulent use of the FC to manufacture false allegations of sexual abuse against Hilary's parents. No one has pointed to, and we are unable to discern, any provision in the IDEA that provides substantive or procedural protection against such atrocity. The Plaintiffs' remedy, upon proving their claims, lies elsewhere. We therefore hold that the district court erred in denying summary judgment for Dearborne on

32

all claims bottomed on the IDEA.

## C. Plaintiffs' State Law Claims

Dearborne asserts state statutory immunity from liability as to all of Plaintiffs' state claims, citing Texas Education Code Section, § 22.051(a), a school employee immunity provision. The Texas Education Code provides:

> A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

TEX. EDUC. CODE § 22.051(a).

The parties do not dispute that Dearborne was an employee of the school district or that she was acting within the scope of her duties. Rather, they differ on the issue of whether Dearborne's alleged actions should be classified as ministerial acts outside of her statutorily protected discretion. A ministerial act is an act "[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Downing v. Brown*, 935 S.W.2d 112, 114 (Tex. 1996)(citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)). Ministerial actions "require obedience to orders or the performance of a duty to which the actor has no choice . . . . On the other hand, if an action involves personal deliberation, decision and judgment, it is discretionary.

33

. . ." *Id.*

The district court found that the summary judgment evidence created a fact issue concerning the discretionary versus ministerial nature of Dearborne's actions, and consequently denied summary judgment for Dearborne based on state statutory immunity from liability. We agree that genuine issues of material fact remain on the question of Dearborne's claim of statutory immunity from liability. The parties focus on whether the use of the FC machine was contrary to school district policy. If there was a policy forbidding the use of the FC machine in Hilary's case (the summary judgment record reflects that a genuine dispute remains on this point) Dearborne was outside the scope of immunity granted by state law. Further, even if utilization of FC was within the discretion granted to Dearborne by the school district, she is not entitled to summary judgment on her state statutory immunity claim. Manufacturing evidence of sexual abuse of a child is not within the parameters of any imaginable discretion granted by the Texas statute. The argument that Dearborne could, with immunity, violate the Texas criminal statute forbidding false child abuse reports, is without merit. *See* TEX. FAM. CODE § 261.107.

## IV. Conclusion

Based on the foregoing, we affirm the district court's denial of summary judgment on Dearborne's qualified and statutory immunity defenses to Plaintiffs' claim of violation of the constitutional right of family integrity and their state law claims. We reverse

34

the denial of summary judgment on the Plaintiffs' bodily integrity, sexual harassment and IDEA-based claims.  We remand for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part and REMANDED.

E. GRADY JOLLY, Circuit Judge, specially concurring:

Although I agree with many of the majority's observations and conclusions in this case, I would not decide this case under the Fourteenth Amendment's Substantive Due Process doctrine. I would hold that the plaintiffs have alleged facts sufficient to support a Fourteenth Amendment procedural due process claim.

The Fourteenth Amendment's Due Process Clause guarantees parents the right to a process that is fundamentally fair before having their children removed from their custody. Santosky v. Kramer, 455 U.S. 745, 753-54 (1982). Based on the allegations asserted in this case, the parents were deprived of fundamentally fair procedures when a state actor (Dearborne) intentionally sought to have fraudulent evidence introduced into the procedures provided by the state. Furthermore, the right violated here--the right to have fundamentally fair procedures before the state can remove a child from its parents--was a clearly established right: If a right to "fundamentally fair procedures" means anything, it means the right to a process not purposely influenced with fraudulent evidence by a state actor.

That this case is properly seen as presenting a procedural, and not substantive, due process claim is evident from the Supreme Court's articulation of the purpose of the Due Process Clause. The Supreme Court has described this purpose as one "to secure the individual from the arbitrary exercise of the powers of government." Daniels v. Williams, 474 U.S. 327, 331 (1986). Procedural due

36

process accomplishes this end "[b]y requiring the government to follow appropriate procedures when its agents decide to 'deprive any person of life, liberty, or property . . .'" Id. In contrast, the substantive due process doctrine

> bar[s] certain government actions regardless of the fairness of the procedures used to implement them, [and the doctrine thereby] serves to prevent governmental power from being 'used for purposes of oppression.'

Id. (citations omitted). Under the allegations in the instant case, the plaintiffs were subjected to patently unfair procedures through Dearborne as a state actor, and, consequently, the government arbitrarily, and unconstitutionally, denied them custody of their child as a matter of procedure.

Thus, it seems to me that the majority ignores the Supreme Court's recent iteration of the long established rule that "where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [the plaintiff's] claims." County of Sacramento v. Lewis, 118 S.Ct. 1708, 1714 (1998) (citations and quotation marks omitted) (describing this as "the rule in Graham"[11]). Although this rule

---

[11]Graham v. Connor, 490 U.S. 386 (1989). The Lewis Court did apply the doctrine of substantive due process after it concluded that the Fourth Amendment did not cover the plaintiffs' claim. Lewis, 118 S.Ct. at 1715.

37

speaks of a "particular amendment" preempting consideration of the claim under the substantive due process doctrine, the reason for the rule in Graham--that the Supreme Court has "always been reluctant to expand the concept of substantive due process"[12]--makes clear to me that an analysis under the procedural due process doctrine should preempt our consideration of the plaintiffs' claim under the doctrine of substantive due process. Thus, while I concur with the majority that the case must be remanded,[13] I respectfully disagree with the majority's analysis of the plaintiff's allegations as a substantive due process claim.

---

[12] Lewis, 118 S.Ct. at 1714 (quoting Collins v. Harker Heights, 503 U.S. 115, 125 (1992)).

[13] I agree with the majority's disposition of the plaintiffs' claims involving the right to bodily integrity and freedom from sexual harassment, the Individuals with Disabilities Education Act, and state law.