Jim MORRIS, Individually & a/n/f
of Hillary Morris, a minor

Gloria MORRIS, Individually & a/n/f
of Hillary Morris, a minor

v.

Charlotte Hawkins DEARBORNE,
et al.

No. 2:96CV111.

United States District Court,
E.D. Texas,
Marshall Division.

Sept. 27, 1999.

& Coleman PLLC, Longview, TX, for Charlotte Hawkins, defendant.

R Laughton Whitehead, Jr, Law Offices of R L Whitehead Jr, Longview, TX, for Whitehouse Independent School Dist.

Peter Breece Plotts, III, Attorney General Office, Austin, TX, for Lea Proudfoot, Anne Perry, Sheila Mendonza, Cayla Davis, Texas Dept of Protective & Regulatory Services, Texas Department of Human Resources, Child Protective Services, defendants.

Herschel Tracy Crawford, Ramey & Flock, Tyler, TX, for Karen Goforth, Robert Geffner, Carolyn Ewbank, P.C, defendants.

## MEMORANDUM OPINION

HEARTFIELD, District Judge.

Pending before the court is the Motion to Dismiss and for Summary Judgment filed by Defendant, Texas Department of Protective and Regulatory Services (TDPRS) and others (Doc 125).[1] A hearing was held on this motion on August 25, 1999. All parties were present by and through counsel, including defendants Dearborne and CTPS, who are not parties to this motion.

By separate order, the court vacated the referral of this motion to United States Magistrate Judge Wendell C. Radford.

*Factual Background*[2]

Hillary Faith Morris, a four-year-old in the fall of 1992, had been diagnosed as having elective mutism; that is, she was

J Don Westbrook, Coghlan Crowson et al, Longview, TX, for Jim Morris, Gloria Morris, plaintiffs.

Thomas Phillip Brandt, Fanning Harper & Martinson, Dallas, TX, Joe Beck Hairston, Walsh Anderson et al, Austin, TX, Gary Harold Shaver, Boon Shaver Echols

1. The "state defendants" involved in this motion consist of the state agency, TDPRS, and the following individuals: Ann Perry (caseworker), Lea Proudfoot (caseworker), Cayla Davis (supervisor), and Sheila Mendoza (supervisor). Plaintiffs have withdrawn their complaint against Sheila Mendoza. Also still in the case as defendants are the counseling and testing firm of CTPS, Karen Goforth (counselor and foster parent), Dr. Robert Geffner (psychologist and supervisor) and Carolyn Ewbanks (a partner in CTPS). CTPS filed a separate motion for summary judgment which was denied by United States District Judge William Wayne Justice.

2. Much of the factual background of this case is taken from the Fifth Circuit's opinion on Dearborne's appeal of the denial of her motion for summary judgment, found at 181 F.3d 657 (5th Cir.1999) (hereinafter referred to as *Morris* ). The court also relies on the parties' factual recitations in the live pleadings, motion for summary judgment and for dismissal, responses, replies, supplemental briefing requested by the court, and the arguments of counsel at the hearing on this motion.

able to speak but refused to do so, mainly around strangers. This was due, in part, to a speech impediment which she eventually outgrew. Hillary received treatment from the firm of Counseling, Testing, and Psychological Services (CTPS). She was under the care and treatment of Dr. Robert Geffner, a psychologist, and attended counseling sessions with Karen Goforth, a counselor.[3] A speech pathologist recommended that the Morrises enroll Hillary at Cain Elementary School in the Whitehouse Independent School District (WISD) to receive speech therapy. Based upon this recommendation, in September 1992 Jim and Gloria Morris enrolled Hillary at Cain. She was placed in the special education early childhood class. Charlotte Dearborne was her teacher.

On September 16, 1992, just a few weeks after her enrollment, Dearborne had Hillary use a machine called a Facilitative Communicator (FC), a device similar to a word processor, utilizing a procedure called Facilitated Communication. In this process a person, called the facilitator, supports the arm of a developmentally disabled or mechanically challenged individual so as to allow that person to type. This FC session was conducted without the permission of the parents.[4] Through numerous studies, the process was known at the time to be highly controversial, in large part due to the fear that the facilitator, and not the individual typist, actually would control the output on the device.[5] Plaintiffs allege that the machine is not to be used with children as young as Hillary was at the time, and serves no purpose to

a child who is not yet literate. Additionally, Dearborne had only received one day of training on how to use the FC, and WISD had a policy of not using the device with children *without* physical disabilities, such as Hillary.

At the initial FC session, which was also Dearborne's first attempt to use the FC with a student, Dearborne guided Hillary's hand to type. Hillary then allegedly typed, on her own, allegations of sexual abuse against her parents. The child allegedly implicated her father in sexual abuse. She also allegedly indicated that the mother knew about the abuse at the hands of the father but did nothing to prevent it, and that the mother participated in the abuse herself. At the time, Hillary did not know how to read or write, and did not know all the letters of the alphabet. As Dearborne guided her hand, Hillary typed a number of sexually explicit and graphically violent phrases. Dearborne did not conduct a reliable test to determine her own influence on the output, although she knew the risks of facilitator influence.[6] Nevertheless, to test the accuracy of the FC process, she dictated a sentence for the child to type. Dearborne maintains, and even wrote on the FC printout, that Hillary typed the sentence "in a flash" using correct spelling. *See* Plaintiffs' First Amended Original Petition, Exhibit A.[7]

Dearborne and WISD contacted TDPRS, but not the Morrises, about the sexual abuse allegations. The next day, September 17, 1992, an employee of TDPRS, Lea Proudfoot, a caseworker as-

---

3. Geffner was Goforth's supervisor at CTPS.

4. WISD had a policy at the time of not using devices on special education students without parental approval, in accordance with the Individuals with Disabilities in Education Act (IDEA). Use of specific services prior to parental approval is contrary to the provisions of the Individuals with Disabilities in Education Act (IDEA), which requires an Individualized Education Plan (IEP) to be developed for each child, with the parents' participation. Use of the FC was not part of Hillary's IEP. 20 U.S.C. § 1400 *et seq.*

5. A policy statement was issued by the American Academy of Child and Adolescent Psychiatry on October 20, 1993 which stated in pertinent part that the FC is not a scientifically valid technique for individuals with autism or mental retardation, and should not be used to confirm or deny allegations of abuse.

6. Dearborne stated that she was "too busy" to conduct such tests.

7. The remainder of the FC printouts which were made available to plaintiffs are attached as Exhibits B through H of the same document.

signed to investigate the allegations, and Melody McKay, a Smith County Sheriff's Deputy, went to Dearborne's classroom and observed an FC session. During the session, it was abundantly clear that Dearborne, and not the child, was producing the messages.[8] The session again produced a printout which implicated the parents in sexual abuse, using correctly spelled anatomical terms for genitalia, and compound predicates. All of this allegedly coming from a child who could not read, write, or recite the alphabet. The child *never* verbalized any allegations of sexual abuse.

Based upon the printout, the child was removed from her parents' custody. State agents went to the Morrises' home in the middle of the night on September 17, 1992, and forcibly dragged Hillary out of her parents' home, according to plaintiffs. TDPRS then filed suit to *permanently* terminate the Morrises' parental rights.[9] The day following the removal the state district court held a hearing to determine whether removal was in the best interests of the child. Despite being informed of the hearing, TDPRS *did not inform* the Morrises of the date, time, and location. The court found that removal was in the best interests of the child, ordered that the removal continue, and placed the child into foster care. Hillary's counselor at CTPS, Karen Goforth, was designated as her foster parent.[10] The state district court based its determination on the information provided to TDPRS by Dearborne, and affirmed by Proudfoot.

As part of the ongoing sexual abuse investigation, Hillary was physically examined by two independent physicians. Both exams revealed no evidence of sexual abuse, and both doctors reported an otherwise "normal" exam.[11] TDPRS contacted CTPS to provide continuing therapy to Hillary and to further test the allegations. Pursuant to TDPRS policy, Proudfoot investigated the allegations; however, she never verified whether Hillary could read or write. And, despite being told the day following removal of the dangers of FC, she simply took the FC printouts at face value and assumed that the Morrises were abusing their child. TDPRS encouraged the parents to submit to polygraph examinations, which they both did and passed; however, TDPRS obviously ignored these test results.

Proudfoot issued a narrative report which became a permanent part of the

---

8. Unbelievably, the state defendants claim that they cannot be held liable because Proudfoot was not the one manipulating the child's hand. Who was the state caseworker who observed the manipulation, seeing that it was not the child's own action but that of Dearborne? Proudfoot. Who was the state worker who asked the child explicit questions, while the teacher facilitated the resulting answers? Proudfoot. Why did she not take action? Admittedly, even she does not know. Plaintiffs point out an analogous situation— what if a police officer directs a citizen to shoot an innocent bystander? Is he not just as guilty, or negligent, acting under color of state law, for directing the action as the shooter himself? The state cannot escape liability, neither in the example nor in this case, simply because they directed someone else to engage in a negligent act or stood by and watched as it was done in their presence. This is most disheartening, particularly in light of the fact that Proudfoot knew that the allegations made through the FC were inherently unreliable.

9. The court emphasizes that the suit sought permanent, rather than temporary, removal and termination of parental rights. There is a legal, and procedural, distinction between these types of suits. *See generally, Morris, supra; see also Discussion, infra* at 20.

10. Hillary remained in the care of Goforth for three months, then was placed with a maternal aunt, Ms. Maudlin, for the next two and one-half years.

11. This was despite the allegation the child supposedly typed which stated that she was forced to have intercourse six (6) times a week. It is difficult for this court to imagine that a four-year-old child has any concept of how many times within a week that a given event may occur. A child of this young age, more than likely, does not have the reasoning abilities to grasp an abstract concept such as the passage of time, days, or weeks.

child's file at TDPRS. She was required to include all significant events in the chronological narrative; however, she did not include information that during the September 22, 1992 FC session, the child could not type any words confirming sexual abuse, nor did she include information that this session *even occurred at all.* She also left out the fact that she conducted a third interview with the child which was videotaped. Proudfoot also claimed that a tape was made of her initial interview with the child which she turned over to the Smith County Sheriff's Department. No such tape has ever been produced and likely does not exist.[12] At her deposition, Proudfoot could offer no reason why this essential information was omitted from her report.[13]

**12.** At the hearing on this motion, plaintiffs' attorney reported to the court that one video tape has surfaced, of an FC session with Dearborne and a caseworker occurring five days after the removal. Counsel did not identify the caseworker by name. This tape records one of two FC sessions at which a state caseworker was present with Dearborne. At this session, the caseworker is seen very close to the child's face, literally within inches of her, asking her if she wants to type, if she wants to tell them anything. The child is visibly shaken, holding her hands up, shaking her head and crying; nevertheless, she is forced to use the FC. It is obvious in the tape, counsel argued and plaintiffs' experts agreed, that it is *Dearborne* who is manipulating the child's hands on the keyboard and producing the messages, *not the child* herself. Plaintiffs' counsel argued that this is the tape which was "deep-sixed" and not mentioned in Proudfoot's report.

**13.** Proudfoot also included information in her report that Gloria Morris, the child's mother, was herself a victim of sexual abuse. Plaintiffs claim that there is no basis in fact for this information, and that it is completely untrue. That this information was included in the report is quite puzzling, since Proudfoot never interviewed the parents or conducted an investigation into their backgrounds. So, where did this allegation come from? Proudfoot also admitted that, after she learned the child could not type on her own, she relayed that fact to Geffner. She had no explanation as to why she did not document this important occurrence in the child's case file.

**14.** The prior professional relationship between the Morrises, Geffner, and Goforth be-

For the next eight months, the child was subjected to explicit sexual language and behavior, through continued counseling sessions at CTPS with Geffner and Goforth.[14] Additionally, during this time, and against both the instructions of TDPRS and Goforth, in her capacity as Hillary's foster parent and counselor, Dearborne continued to conduct FC sessions with Hillary. Graphic themes of sexual conduct and violence were explored, along with religious themes.[15] Despite instructions from the child's caseworker, counselors, and others to stop, Dearborne conducted a total of eleven sessions with Hillary, all without the Morrises' permission.[16] She also contacted Goforth and stated that they must do everything possible to ensure

*fore* Hillary was removed created a conflict of interest which apparently was never an issue with CTPS or TDPRS. Geffner eventually issued a report at the request of TDPRS that stated, in his opinion, Hillary had been molested. He stated that his opinion was based upon his own independent observations, and not just on the initial report from Dearborne. He recommended that she remain in foster care. Obviously, after months of being exposed to graphic and violent sexual themes and vulgar language, a suggestible young child will most likely pick up on it and perpetuate the false allegations on her own. Was that possibility explored?

**15.** The child allegedly typed the phrases "JACK EQUALS JIM" and "ALWAYS BELIEVE ME ALWAYS." The child also wrote, with Dearborne's help, the words "PENIS", "VAGINA", "F* *KED" and the phrases "SON OF A BITCH" and "SICK IN MYT [sic] SOUL ALWZAYS [sic] FRIGHTENED" among others. The session also included matter allegedly indicating that the child had multiple personalities (three females: Jezebel, Mary, and Lana; and one male: Bobby), asked for Dearborne to say prayers for her, said prayers for herself, and thanked Dearborne for saving her life. Hillary also allegedly typed on her own that her mother participated in the sexual abuse, and helped the father to perpetuate the abuse. Hillary also allegedly typed the phrase "JIM RAPES HILLARY WITH HIS PENIS."

**16.** Dearborne was told to discontinue FC sessions in late September by Proudfoot. In April 1993, Hillary's maternal aunt and foster mother, Ms. Maudlin, told Dearborne to stop.

that the child not be returned to her parents.

When others attempted to conduct FC sessions with the child, no results were attained. Only when Dearborne conducted the sessions did the child produce any legible results. In fact, in an FC session with Goforth on October 28, 1992, the child typed jibberish and said that it meant "My Momma, I love you." The child also typed other unintelligible words and stated that those words meant "Daddy" and "My Momma loves you and Hillary—everyone loves you." Despite knowing that these counseling sessions were videotaped, TDPRS workers did not view the tapes. Had the tapes been viewed, TDPRS would have seen and heard the language the child was exposed to and the fact that she was unable to use the FC without Dearborne being the facilitator.[17]

■ Additionally, when shown anatomically correct dolls at a counseling session at CTPS, Hillary referred to the male's genitalia as a "dangy" and the female's as a "yah," not ever using the correct anatomical terms which Dearborne claimed the child typed herself in the FC sessions. Hillary's caseworker, Anne Perry, to whom the case was assigned after the removal, noticed while observing supervised visits with the child's mother that Hillary could not read. Perry knew *right then* that if the child could not read, it was *impossible* that she could have typed the explicit allegations against her parents; however, she took *no steps* to return the child to her home. Perry also knew of the vulgar language used with the child, and even used the same type of language herself in her own meetings with the child.[18] While admitting that the FC was the sole basis for removal, Perry knew that the child could not type a single word on the FC.[19]

Perry also engaged in omitting, or covering up, essential facts revealed during the investigation. A document entitled "Initial Family Assessment Form," which indicates that TDPRS has conducted an assessment of the family within 45 days of the child's removal, was back-dated by Perry, when she knew that this assessment had not been performed at all. Perry and Davis, her supervisor, developed a "family service plan" which required the Morrises to admit they had abused Hillary, which they obviously refused to do.[20] This

Again in April 1993, Goforth told Dearborne to stop. On April 14 and 29, 1993, Dearborne again used the FC with Hillary.

17. The child was made to play a game where she was given points for circling the words "f* *k" and "penis;" however, she was never able to do so without prompting. Additionally, Goforth asked the child to draw "lick penis" and "f* *k" and even asked the child to "show [her] how to f* *k." These counseling sessions took place under the supervision of Geffner, through CTPS.

18. Plaintiffs' expert opined that the continued use of such language was abusive and extremely harmful to the child.

The Eighth Circuit recently issued an opinion dealing with the issue of a child's substantive due process right to bodily integrity. If social workers make a custody decision which knowingly places a child in a harmful situation, they may be held liable for their actions on a constitutional tort theory. *See S.S. v. McMullen,* 186 F.3d 1066 (8th Cir.1999). The court held that, even though children do not have a substantive due process right to be protected from abusive adults, the state *may not itself* subject children to abuse by knowingly delivering them into the hands of abusive caregivers. The court went on to discuss that a child has a "negative liberty interest" not to be injured by the state. What a novel idea. Hillary's continued exposure to sexually explicit language was harmful, even according to her own caseworker, who made no attempt to remove her from that harmful environment, despite repeated requests by the Morrises. This harm was perpetuated by the state, through TDPRS, which claims the highest of interest in protecting children from abuse and neglect.

19. Perry's supervisor at TDPRS was Cayla Davis. While plaintiffs have dropped their allegations against the other supervisor involved in the case, Sheila Mendoza, they are going forward with the allegations against Davis.

20. Perry even urged Gloria Morris to seek a divorce from Jim Morris, stating that she

insured that Hillary would not be returned to her parents, by virtue of this "plan" developed by Perry and Davis. Neither conducted an investigation into the Morrises' background, refused to interview a list of family members and friends provided by the Morrises, and neither ever conducted a home visit.[21]

A relative of the child's mother informed the school in October 1992, a month after her removal, that Hillary could not read or write the messages attributed to her and, in fact, she could barely write her own name.[22] The school was also informed that the child had no motor deficiencies such that she would need to be assisted in typing. This physical fact would have been readily obvious to anyone who observed the child. Those observing the child in the months after the initial removal noted that she could not read. Despite this wealth of information, and WISD's policy of not using FC on children without motor skill deficiencies, *nothing was done.* Dearborne continued in her scheme to keep

Hillary from her parents, continued to conduct FC sessions, and succeeded in helping the state to keep Hillary from her parents for almost three years.[23]

Soon after the removal, Goforth observed an FC session with Dearborne in which the child did not even look at the keyboard while typing the allegations; however, Dearborne was looking at the keyboard and screen. When Goforth asked Dearborne to turn her head while the child typed, the words then became illegible.[24] In April 1993, after the state-appointed psychologist reported that the FC printouts were unreliable, Goforth *finally* reported her own observations to TDPRS that the typing from the FC was invalid. Nevertheless, the child *still* was not returned to her parents.[25]

TDPRS, through Proudfoot, Perry, and Davis, and also through CTPS counselor Goforth, knew the following facts, at least as early as April 1993, yet did nothing to return the child to her parents or investi-

---

would return Hillary to her if they were divorced. For an agency which is *mandated by the state* to reunite families and encourage families to get back together, this action is abhorrent.

**21.** These actions are in direct contravention of TDPRS administrative regulations, rules, and guidelines, not to mention the state statutes governing the operation of TDPRS and setting the guidelines for its caseworkers.

**22.** This is contrary to the information defendants rely upon: the child was reported to have linguistic ability beyond her age, according to the mother. What parent does not brag about, even exaggerate, their own child's abilities? Regardless of the mother's observations and opinions about Hillary's abilities, it became clear to the state defendants early on in the investigation that the child could not read, could not write, and did not have these heightened abilities reported by the mother. Yet, *again*, nothing was done to return the child to her home.

**23.** WISD's superintendent, Marshal Neill, was informed of Dearborne's use of the FC, the vulgar language she used, and the graphic sexual themes she explored with Hillary. He did nothing about it.

**24.** *Incredibly,* Dearborne stated that the child could type "better" when Dearborne was looking at the screen. If this was not *blatant* evidence that the allegations were wholly fabricated by Dearborne, *nothing* would have convinced TDPRS that the allegations were false.

**25.** At the hearing on this motion, counsel for the state defendants indicated that the child was in need of "reevaluation" after being in foster care for so long. Once she was referred to another psychologist who found no evidence of sexual abuse, Hillary was returned to her family. There is no evidence or explanation in the record, and none adduced at the hearing, as to *why* this child remained in foster care for three years. And why, after six months in foster care and the sole basis for removal was discredited by the psychologist, was she not returned then? A question of fact exists as to "how long is too long" for removal of a child this age before the *state* becomes the actor harming the child. *See* note 18, *supra.* The state made, and continued to make, decisions which harmed plaintiffs after ample opportunity for cool reflection. At any rate, the continuum shifts and the state's interest becomes negligible when they are perpetuating the harm to the child. *Id., Morris, supra. See also Discussion, infra,* p. 883–84.

gate the reliability of the allegations further: (1) the FC printouts were invalid, (2) Hillary could not read, (3) Hillary could physically type without assistance, but could not even spell her own name, (4) Hillary never verbalized abuse, (5) Hillary did not know the meanings of the graphic language or anatomical terms she was exposed to, and (6) Hillary had two normal physical exams.

Jim Morris had no contact with his daughter for nearly 36 months, from September 17, 1992 until September 6, 1995, despite his repeated requests to Perry for *at least* supervised visits. He was not even allowed to communicate with Hillary at all, by any means whatsoever. Gloria Morris was allowed supervised visits during that time period. TDPRS finally returned Hillary to her home and dismissed the termination suit *without prejudice* in September 1995. Thus, plaintiffs are still listed in a state database as alleged child sexual abusers, which has prevented Jim Morris from obtaining employment in his field.[26] The Morrises together have suffered other tangible damages and losses as a result of being designated as child abusers in this database, not the least of which is that Jim Morris was fired from his position as a juvenile detention officer due to the allegations and has since been unable to obtain employment in his field. The family remains under TDPRS supervision, and live in fear that the state will once again attempt to remove their only child from their custody. The agency continues to maintain that the parents molested their child. Plaintiffs maintain, sadly,

that the allegation of abuse destroyed their marriage. The Morrises are now divorced and share joint managing conservatorship of Hillary.

### Procedural Posture

After this series of events, plaintiffs filed suit against defendants alleging, under 42 U.S.C. § 1983, deprivations of procedural and substantive due process rights, sexual harassment under Title IX, 20 U.S.C. § 1681 *et seq.*, violations of the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, negligence and intentional torts.[27]

Defendant Dearborne filed a motion for summary judgment claiming qualified and statutory immunity. Dearborne also alleged statute of limitations, and challenged the evidentiary and legal basis of plaintiffs' claims under Title IX and IDEA. United States District Judge William Wayne Justice granted the motion as to plaintiffs' Title IX claims, but denied it on all other grounds.[28] Dearborne then filed an interlocutory appeal to the Fifth Circuit Court of Appeals. The case was stayed at the District Court level pending resolution of the interlocutory appeal.

An opinion affirming in part, reversing in part, and remanding for further proceedings was issued by the Fifth Circuit Court of Appeals on July 16, 1999.[29] A motion for rehearing *en banc* was denied by the Fifth Circuit on September 14, 1999, and all stays in the case have now been lifted.

---

26. Despite non-suiting their case, Defendants refuse to remove plaintiffs' names from the CANRIS list, which lists "confirmed" sex abusers.

27. Plaintiffs now claim no cause of action for intentional torts as against the individual caseworkers, or the state itself. *See* Plaintiffs Response to Defendants' Motion for Summary Judgment, page 29. There is no § 1983 claim against the state itself, only as to the individual caseworkers in their official capacities. There does exists a claim under the Texas Tort Claims Act for the use of the FC by the state. *See Discussion, infra.*

28. Referred to hereinafter as *Justice Opinion.*

29. The Fifth Circuit affirmed the District Court's denial of summary judgment on Dearborne's qualified and statutory immunity defenses to plaintiffs' claim of violation of the constitutional right of family integrity and state law claims, finding that the constitutional right to family integrity was clearly established at the time of the conduct in 1992. The court reversed the denial of summary judgment on the plaintiffs' bodily integrity, sexual harassment, and IDEA-based claims. The case was remanded for further proceedings consistent with the opinion.

*Summary Judgment Standard*

Summary Judgment is to be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "The mere existence of a factual dispute does not by itself preclude the granting of a summary judgment. '[T]he requirement is that there be no genuine issue of material fact.'" *St. Amant v. Benoit,* 806 F.2d 1294, 1296 (5th Cir.1987) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Even if a fact is undisputed, but a reasonable inference could be drawn from the fact in favor of the non-moving party, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *Reid v. State Farm Mutual Auto. Insurance Co.,* 784 F.2d 577, 578 (5th Cir.1986). A factual dispute is "material" if "its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Texas Manufactured Hous. Ass'n. Inc. v. City of Nederland,* 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied,* 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). "There is no genuine issue of material fact if the evidence is such that, drawing all reasonable inferences in favor of the nonmovant ... a reasonable jury could not return a verdict in his favor." *Atkinson v. Denton Pub. Co.,* 84 F.3d 144, 148 (5th Cir.1996). The movant carries the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "After the movant has presented a properly supported motion for summary judgment, the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Texas Manufactured*

*Housing Ass'n, supra* at 1099 (quoting *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir.1994)).

The court must believe all evidence of the non-moving party; in other words, the court assumes the truth of the non-moving party's evidence. *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment is appropriate only if the record reviewed in the light most favorable to the non-movant discloses that the is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

*Discussion*

### Is There a Case or Controversy?

 In their first cause of action, plaintiffs seek a declaratory judgment regarding the constitutionality of disputed governmental actions; therefore, they must show that an actual controversy exists. The Declaratory Judgment Act expands the scope of available remedies and permits persons to seek a declaration of the constitutionality of a disputed governmental action. 28 U.S.C. § 2201; *see also Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Plaintiffs seek a declaration that defendants' actions were unconstitutional, and ask the court to issue a permanent injunction against defendants to prevent further harassment or interference with their family in the future.[30] Defendants claim that summary judgment is appropriate because there is no controversy, and plaintiffs have invoked jurisdiction wrongfully based upon the Declaratory Judgment Act.

 A declaratory plaintiff has a reasonable apprehension of litigation with defendant, such as might satisfy the actual controversy requirement of the Declaratory Judgment Act, only if it can point to conduct by defendant which supports that asserted fear. The focus is on defendant's

---

**30.** In this regard, plaintiffs seek removal of their names from the CANRIS database, and to be removed from the supervision of TDPRS.

conduct toward plaintiff. *State of Texas v. West Publishing Co.*, 882 F.2d 171 (5th Cir.1989) (*citing Crown Drug Co. v. Revlon, Inc.*, 703 F.2d 240 (7th Cir.1983)). Plaintiffs must show that they are in immediate danger of sustaining a direct injury as a result of defendants' conduct: a threat that is real and immediate, not conjectural or hypothetical. *Id.*

■ Plaintiffs have met this requirement, particularly in light of the placement of their names in the CANRIS database and repeated refusal by defendants to remove plaintiffs' names, despite the fact that defendants claim no interest in plaintiffs. Defendants non-suited the action in state court, without prejudice to refiling; thus, defendants could move forward at any time. Additionally, plaintiffs are *still required* to meet with the court appointed counselor.

■ This case fits squarely within the meaning of the "capable of repetition yet evading review" exception to the case or controversy requirement. When there is a reasonable expectation or demonstrated possibility that the same controversy will recur, an exception exists to the case or controversy requirement. *See Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) *per curiam.* Where, as here, plaintiffs have shown the existence of an immediate and definite governmental action or policy that has adversely affected their interests in the past and continues to affect a present interest, there is a reasonable expectation that the same complaining party would be subjected to the same action again. *Id.*

■ In order to seek a permanent injunction, plaintiffs must show a real and immediate threat that the past injury they have suffered will be continued or repeated. *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). In the context of a suit in which plaintiff seeks permanent injunctive relief from a constitutional violation, the court should first consider whether plaintiff has established the fact of a violation. *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). If plaintiff has proved a constitutional violation, the court should consider whether plaintiff has demonstrated both the presence of a continuing irreparable injury and the lack of an adequate remedy at law. *Id.*

■ The Fifth Circuit held that plaintiffs have shown the violation of a clearly established constitutional right, that of family integrity. *See Morris, supra.* Plaintiffs have alleged facts which, if proven to be true, meet the standard for obtaining a permanent injunction. This case is not moot, and jurisdiction under the Declaratory Judgment Act is proper.

*Sovereign Immunity and the Eleventh Amendment*

■ Defendants claim Eleventh Amendment sovereign immunity from plaintiffs' claims against TDPRS and the state caseworkers in their official capacities. It is the law of the land that the Eleventh Amendment can be construed so as to prevent suits against the state by its own citizens. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *see also Saltz v. Tennessee Department of Employment*, 976 F.2d 966 (5th Cir.1992).

■ However, the Fifth Circuit has held that a "gaping hole" in the shield of sovereign immunity created by the Eleventh Amendment and the Supreme Court is the doctrine of *Ex parte Young.*[31] Acts by state officials which are contrary to federal law *cannot have been authorized* or ratified by the state. Suits seeking to enjoin such wrongful acts are not suits against the state, and a federal court's injunction against such wrongful acts is not a judgment against the state itself. *Id.* (emphasis added).[32]

---

**31.** 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see Brennan v. Stewart*, 834 F.2d 1248, 1252 (5th Cir.1988).

**32.** It would be virtually impossible to imagine that the acts alleged to have been committed by the defendants could have *possibly* been ratified by the state. What a sad state of

The essential elements of a suit under the doctrine of *Ex parte Young* are that the suit must be brought against individual persons in their official capacities as agents of the state, and the relief sought must be declaratory or injunctive in nature and prospective in relief. *Id.* Plaintiffs have complied with these requirements. Eleventh Amendment immunity does not shield the state defendants in this case.

### Official Immunity

Defendants claim that they are entitled to official immunity against plaintiffs' negligence claims. Defendants may be entitled to qualified immunity, but not absolute immunity. *Hart v. O'Brien*, 127 F.3d 424 (5th Cir.), *cert. denied*, — U.S. ——, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999). In order to be entitled to qualified immunity, defendants must show that the individual caseworkers' actions were in good faith and in the performance of their discretionary functions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Good faith immunity shields officials from civil damage liability so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Id.* Whether an official generally protected by qualified immunity may be held personally liable for an allegedly unlawful action turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Id.* at 818–19, 102 S.Ct. 2727.

Qualified immunity shields government officials performing discretionary functions unless their conduct violates a clearly established federal statutory or constitutional right of which a reasonable person would have known. The Fifth Circuit held that the actions of defendant Dearborne violated a clearly established constitutional right asserted by plaintiffs, the right to family integrity, which is clearly protected by the Constitution. *Morris, supra* at 667. The court employed a three step analysis: first, whether the plaintiffs have asserted a violation of a constitutional right at all;[33] second, was the constitutional right clearly established at the time defendants acted;[34] and finally, whether the defendants actually engaged in the conduct that violated the clearly established right.[35] The actions of the state defendants clearly satisfy the third step of this analysis.

Next, the court turns to the question of whether the defendants were acting in good faith. The test to determine if an employee was acting in good faith is whether a reasonable and prudent worker, under the same or similar circumstances, could have believed their acts were lawful in light of clearly established law possessed by the official at the time they undertook their action. *Hart, supra.* The failure on the part of defendants to verify whether Hillary could read, write, or spell is only *one of a myriad* of acts undertaken, or omissions made, in bad faith. Just the failure to undertake this *one* simple act is evidence of bad faith. The Fifth Circuit held that a fact issue exists with regard to the extent to which, if at all, Dearborne subverted the ability of the state court to conduct independent decision making by providing false information, and in so doing withholding true information. *Morris supra* at 673. It naturally flows, with regard to the state defendants, that a fact issue exists as to whether they acted in good faith in rely-

affairs we would be faced with if such actions were the normal, objectively reasonable course of investigative work by state caseworkers and state agencies where our children's welfare, safety, and well-being are involved; not to mention the sanctity of our homes and the integrity of our families.

**33.** *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

**34.** *Id.* at 232, 111 S.Ct. 1789.

**35.** *Kerr v. Lyford*, 171 F.3d 330, 339 (5th Cir.1999) (citations omitted).

ing on Dearborne's assertions after learning that they were false, among other things. The trier of fact must look at defendants' reliance upon known false information, as well as their other acts and omissions to determine the issue of good faith.

 Defendants do not meet the qualified immunity defense by virtue of the nature of the acts undertaken by the caseworkers. When a state employee gathers facts, such actions are quasi-judicial in nature and/or discretionary; however, when the act is mandated by law, the discretionary exception is not available. *Id. See also Tamez v. City of San Marcos,* 118 F.3d 1085 (5th Cir.1997). The Texas Family Code requires TDPRS to make a prompt and thorough investigation of a report of child abuse. TEX. FAM. CODE Ann. § 261.301(a). The evidence shows that Proudfoot's "official" investigation lasted *barely one day,* and that pertinent information was omitted, other information was fabricated, and statutes, administrative rules, regulations, and policies were ignored, misapplied, or not followed at all. This is not evidence of a thorough investigation.[36]

Likewise, § 261.308 requires TDPRS to make a complete written report of the investigation. *Caseworkers do not have the discretion to omit information.* Proudfoot and Perry both admitted that they omitted pertinent information from their respective reports. Additionally, TDPRS policy requires caseworkers to notify parents of any court hearings. This is a *mandatory* function, not discretionary. Plaintiffs were not notified of the initial hearing. Immunity does not allow defendants to escape liability for failure to follow their own procedure, much less those functions mandated by statute. The actions of the caseworkers were mandated by law, not discretionary; therefore, immunity is not available.

 The Fifth Circuit analyzed this case in light of their previous decisions in what they called "nebulous cases."[37] Cases claiming governmental interference with the right to family integrity are properly analyzed on a case-by-case basis, placing them on a continuum between the state's clear interest in protecting children and the family's clear interest in privacy. *Id.* The court opined that when the facts of a case place it in the center of the continuum where the two interests overlap and create tension, the right to family integrity may properly be characterized as nebulous and a defendant may be entitled to qualified immunity. *Id.* However, where the facts of a case place it *squarely on the end of the continuum* where the state's interest is negligible and the family privacy right is well-developed in jurisprudence, a defendant's claim of qualified immunity, based upon a claim that the right to family integrity was not clearly established, will fail. *Id.* at 666 (emphasis added).[38]

Defendants urge the court to place this case in the middle of the continuum, and find that the state defendants may not have been on notice in 1992 that their actions violated the constitutional rights of the family. While this may be the law of the case *with regard to defendant Dearborne standing alone,* this court disagrees with *carte blanc* application of this principle to the other state defendants. In fact, the Fifth Circuit pointed out that, with Dearborne standing alone, there was no

**36.** The acts undertaken by the caseworkers were *supposed to be* mandated by law and were not discretionary; however, it appears that the caseworkers acted with discretion in many areas, not the least of which was their determination as to what information to include in, or exclude from, their reports.

**37.** *See Morris, supra* at 669 *citing Hodorowski v. Ray,* 844 F.2d 1210 (5th Cir.1988), *Doe v.*

*Taylor ISD,* 15 F.3d 443 (5th Cir.1994), *and Kiser v. Garrett,* 67 F.3d 1166 (5th Cir.1995).

**38.** The state's interest in this case became negligible when the caseworkers learned that the FC sessions were unreliable, the child could not read, and the many other facts which came to light and were ignored.

state investigators nor a temporary removal; thus, the analysis now is quite different.

■ It can come as no surprise to the state defendants that their reliance on *admittedly* unreliable information and failing to include pertinent information in narrative reports renders their actions in violation of the Morrises' constitutional right to the integrity of their family and right to privacy. The state defendants, both by their actions and inactions, helped to subvert the integrity of the Morris family. Once it was learned by the state defendants that their actions were based upon unreliable information, the continuum shifted and rendered the state's interest in the child negligible, with the strongest interest then shifting to the Morrises: that interest being regaining custody of their child.

Additionally, the Fifth Circuit made a clear distinction between cases involving temporary removal and permanent removal, as this case was postured in the state court. The cases relied upon by Dearborne and now by the state defendants were concerned with welfare investigative employees' power to *temporarily* remove children from their homes, as opposed to permanently. *Morris, supra* at 669–70. While the Fifth Circuit drew a distinction between teachers and caseworkers, the court plainly stated it was not considering the state defendants' actions; therefore, the Fifth Circuit is not aware of, or chose not to consider, the conduct of the state defendants. The court pointed out that it is the nature of the conduct rather than the actor's particular job that determines the nature of a clearly established right. The court held that this child's three-year stay in foster care does not fall within the exception, or even close to the line, that allows the state to temporarily remove a child for a few days or even a few months to protect her while an investigation is conducted. *Id.* at 671–72. It was *the state* who kept the child for three years and forced the family to endure state-initiated termination proceedings.

### Defendants' Actions Were Not Objectively Reasonable

The next step in the analysis, once it is determined that a clearly established right was violated by defendants' actions, is to determine whether the defendants' actions were objectively unreasonable in light of the facts. *Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir.1993). The Fifth Circuit held that, at the time of the actions in 1992, the right to family integrity was recognized as a clearly established constitutional right. *Morris, supra* at 667.

■ As Judge Justice held in his opinion on Dearborne's motion for summary judgment, long term reliance on discredited evidence is not objectively reasonable. *Justice Opinion*, p. 18. Implicit in the concept of reasonableness is that the information upon which the social worker proceeds *is not known* to be false. *Id. (citing Snell v. Tunnell*, 920 F.2d 673, 699 (10th Cir.1990))(emphasis added). No sensible person would defend as reasonable the belief that holding an illiterate child's wrists imbues the child with the skills of grammar, spelling, and knowledge of anatomical terms. *Id.* at pp. 18–19. This is so whether the child's own hand is attached to a pencil, typewriter, pen, word processor, Ouija board, FC, or any other implement. *Id.* Despite their knowledge that the FC had been discredited, which was the sole evidence relied upon to remove the child in the first place, the defendants continued to keep the child from the parents for another two and one-half years.[39]

Defendants urge the court to adopt the position that there is no evidence that the state defendants knew the allegations against the Morrises were false. There is evidence that the FC was not a reliable device, that the child could not read or write, that the parents passed a polygraph

---

**39.** Defendants do not explain why they discredited the opinions that the FC printouts were invalid, and why they failed to notify the parents of this information.

exam, that the child had two normal physical exams, and *defendants knew this* at the time of their actions.[40] Further, there is evidence that Proudfoot, Perry, and Davis violated state law and TDPRS policy by omitting material from their reports, and fabricating other information. While this court agrees that, at least initially, defendants were acting based upon information provided by Dearborne, the ensuing investigation should have revealed the inherent unreliable nature of the information provided through the FC. The evidence shows with blatant clarity that the state workers became privy to information, separate and apart from that gleaned from Dearborne, that the allegations were, at the very least, unreliable. This is also evident by Proudfoot and Perry's own observations, and that of the child's first foster mother, Goforth.

The caseworkers could have, and *indeed should have,* determined early on that Hillary could not read or write. Once told that the printouts were invalid, an objectively reasonable caseworker would have returned the child to the parents. An objectively reasonable caseworker would have included all information in the narrative reports, and *at the very least,* watched the videotapes of all counseling sessions.[41] As stated by Judge Justice, any reasonable or sensible person, knowing the grave consequences of an error, would seek to confirm a four-year-old child's ability to type and spell the graphic depictions of sexual molestation this child was allegedly able to do, as well as her alleged ability to use contractions, compound phrases, and make contextual references to Biblical figures[42]

and anatomical terms. *Justice Opinion,* p. 19.

■ The actions of the state defendants constitute substantive due process violations which shocks the conscience. *Morris, supra* at 667–68 (*citing County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). The threshold question is whether the behavior of the governmental officer is so egregious, outrageous, that it may fairly be said to shock the contemporary conscience. The Fifth Circuit applied this standard to Dearborne's actions, and the same standard applies to the state defendants. The touchstone of due process is protection of the individual against arbitrary action of government. *Id.* With the knowledge possessed by the state defendants as to the inherent unreliability of the FC as well as the inability of the child to read, write, or spell, the actions taken by the state defendants in disregarding these facts, among their many other acts and omissions, *clearly* shocks the conscience.

### Was the Causal Chain Broken?

■ The Fifth Circuit's opinion as to causation applies equally to the state defendants. While Dearborne was the start of the causal chain, setting in motion a series of events that would foreseeably cause the deprivation of plaintiffs' constitutional rights, the state relied on that initial report in seeking a court determination that removal was in the best interests of the child. After learning that the FC was invalid, *at the first session observed by Proudfoot prior to removal,* the state continued the causal chain by their own ac-

40. Incredibly, TDPRS also required that, as a condition of the child being returned to the home, the Morrises *admit* that they had sexually molested their child.

41. All of these actions have been confirmed as the proper steps to take in such a case by plaintiffs' expert, Dr. Allen. In fact, Dr. Allen opined that no reasonable caseworker would be guilty of the following actions: relying on an FC device which had no scientific basis; failing to corroborate the printouts; failing to

determine if the child could read, write, or spell; using vulgarities with a child; failing to return the child to her home after learning that the FC printouts were invalid; manipulating the child with use of sexually explicit terms; and keeping the child for such an extended period of time.

42. The child allegedly referred to herself as "Jezebel" in the FC sessions, one of her alleged multiple personalities.

tions and inactions which ultimately violated plaintiffs' constitutional rights.

█ As stated by the Fifth Circuit in regard to Dearborne's claims on appeal, the state court's ability to conduct independent decision making was subverted by her first providing false information. In denying Dearborne's motion for summary judgment as to this issue, Judge Justice held that direct participation is not necessary for liability under § 1983.[43] Any official who causes a citizen to be deprived of constitutional rights can also be held liable. *Morris, supra* at 672. The Fifth Circuit agreed with the district court's finding that the requisite causal connection is satisfied if the defendant set in motion a chain of events that the defendant knew or reasonably should have known *would cause others to deprive* plaintiffs of constitutional rights. *Id.* Dearborne argued that the state court's intervention in the proceeding, by making an independent decision, broke the causal link between her conduct and the constitutional violation. The Fifth Circuit disagreed with this proposition. *Id.* at 672–73.

█ The question of causation is intensely factual. *Savidge v. Fincannon,* 836 F.2d 898, 905 (5th Cir.1988); *Morris, id.* Where an independent intermediary, such as a state district court judge, makes a decision based upon an independent review of the facts, that decision breaks the causal chain. *Taylor v. Gregg,* 36 F.3d 453 (5th Cir.1994). However, the chain of causation is only broken where *all the facts* are presented to the intermediary, and where the officer presenting the information does not have a malicious motive to withhold information. *Id.* at 457 (*citing Hand v. Gary,* 838 F.2d 1420 (5th Cir. 1988)). The reliability of the state court's decision is greatly dependent upon the reliability of the information upon which it conducts its analysis.[44] The singular fact that a state court judge issued an order of removal is not enough to break the causal connection between defendants' objectively unreasonable acts and plaintiffs' injuries. *Hand, id.* at 1428.

The summary judgment evidence in this case presents a genuine issue of material fact concerning whether the deliberations of the intermediary were tainted by the actions of Dearborne at the very least, and also those of Proudfoot and others. There exists a genuine issue of material fact as to the extent to which the other state defendants relied on Dearborne's and Proudfoot's representations. As the Fifth Circuit held, a fact issue exists regarding the extent to which Dearborne subverted the ability of the court to conduct independent decision making by providing false information, and in so doing, withhold true information. *Morris, supra* at 673. This holds true also for the state defendants, particularly Proudfoot.[45]

The court cannot resolve the issue of causation by way of summary judgment because there is evidence in the record from which a jury could conclude that, had defendants informed the state district judge of *all of the facts,* removal may have been only temporary *or would not have occurred at all. See Sanders v. English,* 950 F.2d 1152 (5th Cir.1992).

---

43. *Snell v. Tunnell, supra.*

44. What other characterization could there be of the actions of a teacher in manufacturing, and then state welfare agents in perpetuating, false abuse allegations? To say that their motives were anything less than malicious would be a travesty. To say that their actions were merely negligent would be a gross understatement. Because of the actions of Dearborne, and then Proudfoot and others, the state judge's decision was not a fully informed decision based upon all of the reliable, much less *true,* facts. This decision cannot be said to have broken the causal link between the state defendants' actions and the constitutional violation alleged. *Hand, id.*

45. This is true particularly because the subsequent proceedings after the initial removal hearing consisted almost entirely of judicial review hearings where *no new evidence was presented.* The only evidence ever presented to the state district judge was presented by the state defendants.

### Texas Tort Claims Act—Do Plaintiffs' Claims Survive Summary Judgment?

 Plaintiffs allege a cause of action against TDPRS and its employees under the TTCA. The TTCA waives immunity for the tortious conduct of public servants acting within the course and scope of their employment if the negligence arises from the use of tangible personal property if, under the circumstances, a private person would be liable to the claimant under Texas law. TEX. CIC. PRAC. & REM. CODE § 101.021. As a threshold inquiry on summary judgment, the court must find that a genuine issue of material fact exists as to whether the TDPRS caseworkers were acting within the scope of their employment when investigating the allegations of abuse and observing, directing, and relying upon the FC results. The court finds, based upon the evidence in the record, that the caseworkers were indeed acting within the course and scope of their employment with TDPRS. The next inquiry is whether there exists a genuine issue of material fact as to whether the state defendants were using tangible personal property, and whether that use was negligent such that immunity is waived.

Plaintiffs claim that the FC is tangible property under the meaning of the TTCA. Defendants argue that since the FC was not owned by the state, the state cannot be held liable under the TTCA. Defendants also contend that "information" in the form of standards and procedures governing the operation of TDPRS and its employees, together with the written results of the FC, are not tangible property within the meaning of the TTCA. Plaintiffs claim that TDPRS was negligent in failing to properly train and supervise their employees, and by misusing written standards and procedures. Plaintiffs also claim unjustified reliance on the printouts from the FC. Defendants claim that their employees are shielded by qualified immunity and argue that the waiver does not apply in this case. *Lowe v. Texas Tech University*, 540 S.W.2d 297 (Tex.1976).

 There is no question under Texas law that the misuse or non-use of information in records or in a procedure manual does not state a cause of action under the TTCA. *Kassen v. Hatley*, 887 S.W.2d 4 (Tex.1994), *see also UTMB v. York*, 871 S.W.2d 175 (Tex.1994).[46] Claims against the state for misuse of information will fail. *Salcedo v. El Paso Hospital District*, 659 S.W.2d 30 (Tex.1983).[47] While the court agrees with defendants on this point, there is also a claim regarding the *actual use* of, or *direction of the use of,* the FC equipment by TDPRS caseworkers.

 Defendants claim no liability because they did not own the FC. This argument has been rejected by Texas courts. The Texas Court of Appeals has held that a cause of action exists under the TTCA if the alleged injuries occurred at defendants' *direction,* as is the case here. *Jenkins v. State*, 570 S.W.2d 175, 178 (Tex. App.—Houston [14th Dist.] 1978, *no writ*).[48] In *Jenkins*, the issue was the use

---

46. In *UTMB*, the question of liability under the TTCA turned on the use, or misuse, of information in plaintiff's medical records. The court held that information in medical records is not tangible personal property such as would result in waiver of state immunity under the TTCA.

47. *Salcedo* dealt with the misuse of an electrocardiogram machine, which the court found was tangible property; however, the court found that the printout from the machine was not tangible property, and its alleged misuse or misreading was not actionable under the TTCA. The court noted that the purpose of the machine was to produce printouts, which was its intended use; therefore, the allegations that the machine was used improperly did state a claim for misuse under the TTCA, despite the fact that the actual printouts were not tangible property. *Salcedo* is analogous to this case on the issue of whether the FC equipment itself is tangible property, and this court finds that it is.

48. This case has been disapproved by *UTMB*, *supra*. The *UTMB* court disapproved of the *Jenkins* case and others dealing with "information" as tangible property, only to the extent that medical records were at issue in that case. The *UTMB* court did not discuss or disapprove the *Jenkins'* court holding that use or misuse at the direction of state employees, regardless of ownership of the property, is actionable. *Jenkins* is analogous to this case in that regard.

of medical records which caused injuries to plaintiff. The court rejected the argument that defendants were not liable because the records were not prepared, furnished, controlled, or owned by them. *Id.* at 178. When the alleged injuries occur due to the negligence of the state employees, while acting within the scope of their employment, and while engaged in the use of tangible property, a cause of action has been successfully alleged. *Id. (citing Hein v. Harris County,* 557 S.W.2d 366 (Tex. Civ.App.—Houston[1st Dist.] 1977, *writ ref'd n.r.e.)).* If the state employees are responsible for the improper use of the tangible personal property, the state can be held liable. *Sem v. State,* 821 S.W.2d 411 (Tex.Civ.App.—Fort Worth 1991, *no writ* ).[49]

The last inquiry is whether immunity is waived. This court finds that the summary judgment evidence shows that the FC was used in the presence of the caseworkers on at least three occasions, and at one of those sessions, Proudfoot herself asked the questions of the child while the FC was being used. Proudfoot directed Dearborne to facilitate the resulting answers. The state cannot escape liability in this regard simply because they directed someone else to perform their negligent or recklessly indifferent acts, or because they did not own the FC equipment themselves.[50]

 While the court agrees that the information coming from the FC is not tangible property within the meaning of the TTCA, the use of the FC on Hillary was use or misuse of tangible property by virtue of the following facts of record: (1) Hillary was too young to be subjected to FC sessions; (2) Hillary could not read and TDPRS caseworkers never confirmed whether or not she could read; (3) Hillary did not have a physical impairment; (4) FC is not a scientific tool to be used to confirm or deny abuse allegations and is inherently unreliable; and (5) the FC sessions were conducted in violation of WISD policies and federal law.

 The court finds that a genuine issue of fact exists as to whether the TDPRS caseworkers, while acting within the course and scope of their employment, negligently directed the use, or misuse, of the FC by Dearborne such that immunity is waived. The court further finds that the reliance on the printouts, although negligent and actionable under other legal theories, does not raise a cause of action under the TTCA and summary judgment on this portion of plaintiffs' claim under the TTCA is proper.

## Conclusion

The state defendants participated in conducting a sham investigation, withholding exculpatory evidence, violating state law as well as their own policies and procedures, misrepresenting the facts of the case to the state court, and selectively omitting critical evidence from the narrative reports. These actions, at defendants' own hands, raise a multitude of genuine issues of material fact.

The movant carries the burden of showing that there is no genuine issue of material fact. The summary judgment evidence provided by defendants does not meet this burden. The court finds that there exists genuine issues of material fact, as well as material factual disputes in this case.

Summary judgment (Doc 125) is **DENIED** on the issues urged by defendants Texas Department of Protective and Regulatory Services (TDPRS), Ann Perry, Lea Proudfoot, and Cayla Davis, as follows:

1. jurisdiction under the Declaratory Judgment Act;

**49.** The Fifth Circuit has visited the precise issues under the TTCA raised in this case, and cites to many of the Texas cases relied upon by this court and the parties in their opinions. *See Campbell v. City of San Antonio,* 43 F.3d 973 (5th Cir.1995); *Estate of Banks v. Chambers Memorial Hosp. Auxiliary, Inc.* 865 F.2d 696 (5th Cir.1989); *and Hale v. Sheikholeslam,* 724 F.2d 1205 (5th Cir.1984).

**50.** *See* n. 8, *supra.*

2. sovereign immunity and the Eleventh Amendment;

3. official immunity;

4. causation; and

5. Texas Tort Claims Act, only as to the following issues:

 a. whether the FC is tangible property within the meaning of the TTCA;

 b. whether the use, direction of the use, or misuse of the FC was done by the TDPRS employees;

 c. whether the TDPRS employees were acting within the course and scope of their employment at the time of their actions with regard to the FC; and

 d. whether their conduct was negligent such that immunity is waived.

Summary judgment is **GRANTED** as to plaintiffs' claims under the TTCA for the negligent reliance upon the FC printouts. The court finds that the FC printouts, while tangible *pieces of paper*, are not tangible property under the meaning of the TTCA and applicable case law. The printouts contain information, which has been held by the Texas Supreme Court to not be tangible property within the meaning of the TTCA; therefore, this portion of plaintiffs' claim fails.

The motion to dismiss (Doc 125) is **DENIED** for the reasons stated.